# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

DANIEL NYKIEL and ANNEMARI COOLEY, individually, and as representatives of a Class of Participants and Beneficiaries of the Smith & Nephew U.S. Savings Plan,

Plaintiffs,

v.

SMITH & NEPHEW, INC., BOARD OF DIRECTORS OF SMITH & NEPHEW, INC., US PENSION AND BENEFITS EXECUTIVE COMMITTEE OF SMITH & NEPHEW, INC.,

Defendants.

Case No.

**Class Action Complaint For Claims Under 29 U.S.C. § 1132(a)(2)**

---

## CLASS ACTION COMPLAINT

---

COMES NOW Plaintiffs, Daniel Nykiel and Annemari Cooley ("Plaintiffs"), individually and as representative of a Class of Participants and Beneficiaries of the Smith & Nephew US Savings Plan (the "Plan" or "Smith & Nephew Plan"), by their counsel, WALCHESKE & LUZI, LLC, and JONATHAN M. FEIGENBAUM, ESQ., as and for a claim against Defendants, alleges and asserts to the best of their knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the following:

### INTRODUCTION

1.      Plaintiffs, current and former participants, in the Smith & Nephew Plan, bring this ERISA action on behalf of the Plan under 29 U.S.C. §§ 1132(a)(2), and under Fed. R. Civ. P. 23 as representatives of a class of participants and beneficiaries of the Plan, against defendants Smith & Nephew, Inc. ("Smith & Nephew"), the Board of Directors of Smith & Nephew, Inc. ("Board"), and the US Pension and Benefits Executive Committee ("Plan Committee") (collectively, "Defendants")

for breach of ERISA's fiduciary duties and transactions prohibited by ERISA. The claims are brought on behalf of the Plan and seek to remedy losses suffered by the Plan under 1132(a)(2) and 409(a).

2.  Smith & Nephew and the Board are the sponsors of the Plan.

3.  The Plan Committee is the Plan administrator of the Plan and the named fiduciary of the plan identified in the Plan document. The Plan Committee is also expressly vested with discretionary authority to determine whether Plan forfeitures would be used to reduce expenses paid by Plan participants or reduce Smith & Nephew's obligations to make future contributions to the Plan.

4.  All Defendants are either express or de facto ERISA fiduciaries under ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A), with some level of discretionary authority or control over the matters set forth herein. As a result of their relationships with Smith & Nephew, all Defendants were affiliates of Smith & Nephew and shared interests with Smith & Nephew.

5.  Defendants failed to fulfill their fiduciary obligation to manage the Plan prudently and loyally in the interests of the Plan and its participants and engaged in prohibited transactions by engaging in self-dealing with Plan assets.

6.  With 9,968 active participants as of December 31, 2022 and $1.1 billion in assets under management, the Plan is one of the largest retirement plans in the country.  It ranks in the top 0.16 % of over 500,000 American 401(k) plans in terms of the number of participants and the top 0.10% of plans in terms of the value of its assets

7.  As set forth in more detail below, Defendants, as fiduciaries of the Plan, failed to fulfill their fiduciary duties to prudently and loyally ensure the Plan's total recordkeeping and other administrative expenses (such as expenses associated with the managed account feature of the Plan) were reasonable and not excessive, as well as engaged in self-dealing with regard to Plan forfeitures in violation of ERISA fiduciary prohibited transaction rules.

8.  401(k) defined contribution plans such as the Smith & Nephew Plan have become America's primary retirement savings vehicle.  As with all defined contribution retirement plans that require participants to bear the costs of plan administration, the Plan participants' retirement savings

suffer when the Plan charges participants high fees or when companies use Plan assets for their own benefit.

9.    The marketplace for retirement plan services, like recordkeeping and managed accounts, is established and competitive.  Retirement plans the size of the Smith & Nephew Plan have significant bargaining power to obtain very low-cost recordkeeping and administrative ("RKA") and managed account services from financial services providers.  The overall trend in 401(k) plan RKA and managed account fees has been markedly downward over time.

10.    However, because of Defendants' failure to implement a prudent process to control the Plan's overall RKA and managed account expenses, and failure to properly understand and evaluate the amount being paid for those services from all sources despite the express regulatory command to do so, the Plan's participants paid vastly more than what comparable very large retirement plans pay for comparable recordkeeping, administrative, and managed account services.

11.    In addition, the Defendants imprudently and disloyally failed to use the Plan's forfeitures to exclusively reduce the Plan's expenses, instead using very large amounts in the tens of millions of Plan assets to benefit Smith & Nephew by reducing Smith & Nephew's obligation to make future contributions to Plan. This conduct also violated the fiduciary prohibited transaction rules against self-dealing by companies.

## JURISDICTION AND VENUE

12.    This Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331 because this is an action under 29 U.S.C. §§ 1132(a)(2) and (3) for which federal district courts have exclusive jurisdiction under 29 U.S.C. § 1132(e)(1).

13.    This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

14.    This district is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 29 U.S.C. § 1391(b)(2) since a substantial part of the events or omissions giving rise to the claim occurred here.

**PARTIES AND THE PLAN**

15.      Smith & Nephew is a medical technology company focused on the repair, regeneration and replacement of soft and hard tissue. Smith & Nephew employs roughly 20,000 people worldwide, with about 7,500 employees in the United States. The Smith & Nephew Plan and the Plan Committee, according to its most recent Summary Plan Description ("SPD"), is located at 150 Minuteman Rd., Andover, MA 01810.

16.      The Smith & Nephew Plan is a defined contribution employee pension benefit plan under 29 U.S.C. § 1002(2)(A) and § 1002(34).

17.      Smith & Nephew is the Plan's sponsor under 29 U.S.C. § 1002(16)(B).

18.      The Plan Committee is the Plan's administrator within the meaning of 29 U.S.C. § 1002(16)(A), and are fiduciaries for the Plan. In addition, the members of the Committee (the Plan Committee Members) are also fiduciaries for the Plan. "[W]here, as here, a committee or entity is named as the plan fiduciary, the corporate officers or trustees who carry out the fiduciary functions are themselves fiduciaries and cannot be shielded from liability by the company." *Stewart v. Thorpe Holding Co. Profit Sharing Plan*, 207 F.3d 1143, 1156 (9th Cir. 2000).

19.      As required by 29 U.S.C. § 1102(a)(1), the Plan is established and maintained by a written plan document.

20.      Defendants chose Fidelity Investments Institutional ("Fidelity") to provide the Plan's recordkeeping and administrative (RKA) services.

21.      Defendants chose Strategic Advisors, Inc. ("SA"), a wholly-owned subsidiary of Fidelity, to provide managed account services to Plan participants.

22.      Plaintiff Daniel Nykiel is a resident of Collierville, Tennessee. Plaintiff Nykiel worked for Smith & Nephew as a Gage Designer and in various management position in Orthopaedics in Memphis, TN from August 1, 2007, until August 12, 2022, and had an active account in the Plan until January 31, 2023, when he rolled out of the Plan.

23.      Plaintiff Nykiel was invested in the following Plan investments: MFS Int'l Equity Fund R6, Jennison Small Cap Fund, Vanguard Market Index Fund, Hartford Mid Cap Fund Y, Vanguard Institutional Index Fund, Vanguard Morgan Growth Admiral Fund, Vanguard Target 2025 Fund,

Vanguard Target 2050 Fund, Wellington Mid-Cap Fund, BP Large Cap Value Equity CIT, and MIP Class II Stable Value Fund.

24.     Plaintiff  Annemari Cooley is a resident of Salem, Oregon. She has been employed by Smith & Nephew from April 2019 until present as both a Sr. Director Clinical Development (4/19-6/22) and Sr. Director, Medical Education (6/22 to present).

25.     Plaintiff Cooley has an active account in the Plan.  She has also been enrolled in the SA managed account program during her time in the Plan.

26.     Plaintiff Cooley has been invested in the following Plan investments: Vanguard Institutional Stock Market Fund, MFS Int's Equity 3A Fund, Vanguard Market Index Fund, BP Large Cap Value Equity CIT, Vanguard Institutional 500 Index Fund, Vanguard US Growth Admiral Fund, Vanguard Total Bond Market Index Fund, LS Core Plus Fixed Income C Fund, and MIP Class II Stable Value Fund.

27.     Plaintiffs have Article III standing to bring this action on behalf of both the Smith & Nephew 401(k) Plan because they suffered actual injuries through breach of fiduciary duty with regard to recordkeeping and managed account fees and the misallocation of Plan forfeitures by Defendants with regard to the Smith & Nephew 401(k) Plan during the Class Period. Those injuries are fairly traceable to Defendants' unlawful conduct in paying excessive recordkeeper and managed account fees, and using Plan forfeitures for their own benefit, and these injuries diminished the savings in Plaintiffs' retirement accounts in the Plan and reduced, dollar for dollar (and more when compounded) Plaintiffs' retirement savings.

28.     Having established Article III standing, Plaintiffs may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for relief that sweeps beyond their own injuries.

29.     The Plaintiffs and all participants in the Plan did not have knowledge of all material facts (including, among other things, the excessive recordkeeping and managed accounts, as well as the misallocation of Plan forfeitures) necessary to understand that Defendants breached their fiduciary duties until shortly before this suit was filed.

30.     Having never managed a very large 401(k) Plan, Plaintiffs, and all participants in the Plan, lacked actual knowledge of the fees associated with Plan recordkeeping and managed account services, and lacked knowledge of how Plan forfeitures should be allocated.

### ERISA FIDICIARY STANDARDS

31.     ERISA exists, in large part, to protect the interests of participants, and their beneficiaries, in employee retirement plans. *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 208, 124 S. Ct. 2488, 2495, 159 L. Ed. 2d 312 (2004) (citing 29 U.S.C. § 1001(b)).

32.     "[A]ny person who exercises discretionary authority or control in the management or administration of an ERISA plan" is, under the statute's terms, a fiduciary. *See Barchock v. CVS Health Corp.,* 886 F.3d 43, 44 (1st Cir. 2018) (citing 29 U.S.C. § 1002(21)(A)).

33.     ERISA imposes strict duties of loyalty and prudence upon fiduciaries of retirement plans, like the Smith & Nephew Plan, that are covered by ERISA.

34.     ERISA provides that  "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; [and] (B) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in like capacity and familiar with such matters would use in the conduct of like character and with like aims." ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

35.     ERISA's fiduciary duties under have been described as being among the "highest known to the law."  *See Sellers v. Trustees of Bos. Coll.*, 2024 WL 1586755, at *5 (D. Mass. Apr. 11, 2024).

36.     The obligation to ensure that retirement plan fees are reasonable is at the heart of ERISA fiduciary duties. *Marshall v. Snyder*, 572 F.2d 894, 897 (2d Cir. 1978) ("The responsibility for paying reasonable compensation was the unequivocal fiduciary responsibility of the [plan's fiduciaries].").

37.     As courts in the First Circuit have explained, ERISA fiduciaries "have a general duty to monitor recordkeeping expenses and, more generally, ... a prudential duty to be cost-conscious in the administration of a plan[,]" and they "breach their duty of prudence by failing diligently to investigate and monitor recordkeeping expenses as well as other administrative expenses." *Daggett v. Waters Corp.*, 2024 WL 1677421, at *9 (D. Mass. Apr. 18, 2024); *Turner v. Schneider Elec. Holdings, Inc.,*

530 F. Supp. 3d 127, 136 (D. Mass. 2021); *Moitoso v. FMR LLC*, 451 F. Supp. 3d 189, 213 (D. Mass. 2020).

38.    The content of ERISA fiduciary's duties is "derived from the common law of trusts." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2465 (2014). Therefore, "[i]n determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Tibble v. Edison Int'l,* 575 U.S. 523, 528-529 (2015). Under the common law of trusts, fiduciaries may "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." Restatement (Third) of Trusts § 90(c)(3) (2007).

39.    In determining whether ERISA fiduciary defendants fulfilled their duties under the statute, courts consider how a prudent and loyal financial expert familiar with investment industry practices and fees would have acted.  As explained below, here, a prudent and loyal financial expert would have acted very differently than did Defendants.

40.    Defendants failed to fulfill their duty to prudently and loyally control the RKA and managed account expenses paid by the Plan, and in so doing, caused the Plan's participants to incur millions of dollars in unnecessary expenses.

41.    Furthermore, in deciding to use Plan forfeitures to benefit themselves as far as reducing future company contributions through use of plan assets, Defendants engaged in self-dealing in managing and disposing of its assets.

42.    Such self-dealing violates the ERISA fiduciary prohibited transaction rules under 29 U.S.C. § 1106(b).

## FACTUAL ALLEGATIONS

### A.    ERISA's Fiduciary Standards in the Defined Contribution Industry

43.    The Plan is an individual account, defined contribution pension plan covered by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*.

44.    The Plan is funded by a combination of salary withholding by plan participants and employer matching contributions.

45. Participant accounts in the Plan are comprised of employee contributions, any employer contributions and any investment income from the investment options selected within the participant account, less fees and expenses.

46. In a defined contribution retirement plan such as the Smith & Nephew Plan, the plan "provides for an individual account for each participant and for benefits solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses … which may be allocated to such participant's accounts." ERISA § 3(34), 29 U.S.C. § 1002(34).

47. Unlike traditional defined benefit pension plans, which obligate employers to pay a particular amount at retirement (benefits that are guaranteed by the Pension Benefit Guarantee Corporation), participants in defined contribution plans (like the Smith & Nephew Plan) get no more at retirement than they have in their accounts at that time.

48. As such, ERISA's fiduciary duty to ensure fees paid by the Plan are reasonable is especially important in the context of fees paid by defined contribution plan participants, as the fees reduce dollar for dollar (and more, when compounded) the amount of benefits participants will receive at retirement.

49. As the Supreme Court explained in 2015, in defined contribution plans like the Plan, employees' benefits at retirement "are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, **_less expenses_**." *Tibble*, 575 U.S. at 525 (emphasis added).

50. Seemingly small differences in fees can lead to vastly different outcomes at retirement. For example, a 1% difference in fees can mean 28% less in retirement assets over a thirty-five-year period, U.S. Dept. of Labor, A Look at 401(k) Plan Fees, (August 2013) at 1-2, *https://www.dol.gov/ebsa/publications/401k_employee.html.* Therefore, fees are of critical importance to an ERISA fiduciary's prudent investment menu selection.

51. As such, plan fiduciaries like Defendants must: (1) establish a prudent process for selecting service providers and reviewing investments; (2) ensure that fees paid to service providers

are reasonable in light of the level and quality of services provided; and (3) monitor service providers and investments once selected to make sure they continue to be prudent choices.

**B.      Recordkeeping and Administrative ("RKA") Fees**

52.      Defined contribution plan fiduciaries of very large 401(k) plans hire service providers to deliver a retirement plan benefit to their employees. There is a group of national retirement plan services providers commonly and generically referred to as "recordkeepers," that have developed bundled service offerings that can meet all the needs of mega retirement plans with a prudent and materially identical level and caliber of services. Fidelity is the largest of such recordkeepers.

53.      There are numerous recordkeepers in the marketplace who are equally capable of providing a high level of service to very large defined contribution plans like the Smith & Nephew Plan.

54.      The cost of RKA services depends mostly on the number of participants, and less so on the amount of assets in the participant's account.

55.      Because the cost of recordkeeping services depends primarily on the number of participants, the cost of providing recordkeeping services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account.

56.      According to the Smith & Nephew Plan July 8, 2024 Required Disclosure Information pursuant to ERISA Section 404(a)5), "[p]lan administrative fees [or Total RKA] may include recordkeeping, legal, accounting, trustee, and other administrative fees and expenses associated with maintaining the Plan."

57.      There are at least three types of RKA or plan administrative services provided by all recordkeepers and other service providers.

58.      The first type, "Bundled RKA," may include, but are not limited to:

a.      Recordkeeping;

b.      Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

c.   Administrative Services related to converting a plan from one recordkeeper to another recordkeeper;

d.   Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., Summary Plan descriptions and other participant materials);

e.   Maintenance of an employer stock fund;

f.   Plan Document Services which include updates to standard plan documents to ensure compliance with regulatory and legal requirements;

g.   Plan consulting services including assistance in selecting the investments offered to participants;

h.   Accounting and audit services including the preparation of annual reports, e.g., Form 5500;

i.   Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan follows legal requirements and the provisions of the plan;

j.   Compliance testing to ensure the plan complies with Internal Revenue nondiscrimination rules; and

k.   Trustee/custodian services.

59.   The services Fidelity is providing for the Plan and its participants consist in these standard recordkeeping services, and Fidelity is not providing anything exceptional, unusual, or customized, with regard to the Bundled RKA services provided to the Plan and its participants.

60.   Bundled RKA services are necessary for every defined contribution plan. These services for a qualified retirement plan, like the Smith & Nephew Plan, are essentially fixed and largely automated. It is a system where costs are driven purely by the number of inputs and the number of transactions. In essence, it is a computer-based bookkeeping system.

61.   In other words, the Plan provided participants all the commoditized Bundled RKA services provided to all other very large 401(k) plan participants. The quality or type of Bundled RKA services provided by competitor recordkeepers are comparable to that provided by Fidelity and other

non-Fidelity service providers. Any differences in RKA services are immaterial to the price quoted by recordkeepers other service providers for such services.

62.     Bundled RKA services are largely standardized because the RKA providers must provide these services at scale to a large number of plans and must comply with regulatory requirements.  They cannot offer customized sets of services to each individual plan.

63.     The bulk of the fee paid for Bundled RKA services pays for core services that do not vary from plan to plan.

64.     Industry experts have maintained for years that for very large retirement plans like the Plan, prudent fiduciaries treat Bundled RKA services as a commodity with little variation in price. "Custody and recordkeeping are 'commodity' services. Like any commodity, given equal quality, the key benchmark for these services is price. The cheaper you can find competent custody and recordkeeping services, the better for participants." Eric Droblyen, *Evaluating 401(k) Providers: Separating Commodity from Value-Added Services*, https://www.employeefiduciary.com/blog/evaluating-401k-providers-separating-commodity-value-added-services (Feb. 10, 2015).

65.     The Plan provided participants all the commoditized and fungible RKA services provided to all other very large 401(k) plan participants. The quality or type of RKA services provided by competitor recordkeepers are comparable to that provided by Fidelity.

66.     Since well before 2018, industry experts have maintained that for massive retirement plans like the Smith & Nephew Plan, prudent fiduciaries treat RKA services as a commodity with little variation in price.

67.     "Custody and recordkeeping are 'commodity' services. Like any commodity, given equal quality, the key benchmark for these services is price. The cheaper you can find competent custody and recordkeeping services, the better for participants." Eric Droblyen, *Evaluating 401(k) Providers: Separating Commodity from Value-Added Services*, https://www.employeefiduciary.com/blog/evaluating-401k-providers-separating-commodity-value-added-services (Feb. 10, 2015).

68.     Fidelity, the largest 401k recordkeeper in the country, has in fact conceded that the RKA services that it provides to other massive plans are fungible and commodified, including the plan services provided to its own employees.

69.     As part of stipulated facts in a previous case, Fidelity stated: "The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year, and the value of the recordkeeping services that Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity it could have obtained recordkeeping services for these amounts during these periods. *The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period (November 18, 2014 to the present).*" See *Moitoso v. FMR LLC, et al.*, 1:18-CV-12122-WGY, Stipulation of Facts, Dkt. 128-67, at 4-5 (D. Mass. Sep. 6, 2019) (emphasis added).

70.     Because Bundled RKA services are commoditized, recordkeepers primarily differentiate themselves based on price, and will aggressively bid to offer the best price in an effort to win the business, particularly for very large plans like the Plan.

71.     Bundled RKA services are essentially fungible and the market for them is highly competitive. This highly competitive Bundled RKA market is filled with equally capable recordkeepers and other Fidelity service providers, who can provide comparable Bundled RKA services for less if only asked to provide bids to very large plans like the Plan.

72.     Given the very large size of the Smith & Nephew Plan, the price paid by the Plan for Bundled RKA services to Fidelity, and the trend of price compression for Bundled RKA services over the last six years, it is possible to infer that Defendants did not engage in any competitive solicitation of Bundled RKA service bids during the class period.

73.     The second type of essential RKA services, hereafter referred to as "A La Carte services," provided by all recordkeepers, often have separate, additional fees based on the conduct of

individual participants and the usage of the service by individual participants. These "A La Carte RKA" services typically include the following:

    a. Loan set-up fees and loan maintenance fees;

    b. Brokerage services/account maintenance;

    c. Distribution and withdrawal services; and

    d. Processing of Qualified Domestic Relations Orders (QDROs).

74. The third type of RKA fees are Ad Hoc fees which are transaction fees and other administrative fees, and include such things as ESOP fees, fees for service, and terminated maintenance fees.

75. The sum of the Bundled RKA fees, A La Carte RKA fees, and Ad Hoc RKA fees equals the "Total RKA fees."

76. This action focuses on ***Plan Total RKA fees paid to Fidelity*** and related to participant loan processing, recordkeeping fees, and account maintenance fees, as outlined in Schedule C of the 2021 Department of Labor ("DOL") 5500 Form filed by the Smith & Nephew Plan fiduciaries.

77. A review of the Smith & Nephew Plan's Department of Labor 2018 5500 Form, Schedule C, illustrates the direct compensation that the Plan paid to Fidelity, as opposed to other Plan service providers for various Plan services.

78. More specifically, Schedule C of the 2021 Plan 5500 Form contains the following information:

79. For purposes of calculating ***RKA fees paid to Fidelity***, as opposed to amounts paid to other Plan service providers, Plaintiffs utilized direct compensation paid to Fidelity of $604,380 in 2021 as outlined in the 2021 Schedule C, and similar direct compensation numbers for 2018-2020 and 2022 (2023 and 2024 are not yet available).

80. The associated service codes indicate payment to Fidelity for participant loan processing (code 37), recordkeeping fees (code 64), and account maintenance fees (code 65).

81. Importantly, the Smith & Nephew Plan pays separate amounts to other Plan service providers when Fidelity has been the Plan recordkeeper, including to: (1) Mercer for consulting; (2)

Strategic Advisors for investment advisory; (3) Alston & Bird LLP for consulting and legal services; (4) Horne for consulting and auditing services; and (5) Dixon Hughes Goodman, LLP for consulting services.

82.    Although comparator plans, like the Terracon 401(K) and ESOP Plan, Cook Children's Health Care System Retirement Plan, Expeditors International of Washington, Inc. 401(K) Plan, and Operating Engineers Local 66 Annuity and Savings Fund, all use different service codes on their 5500 Forms than the Smith & Nephew Plan, as the Third Circuit recently and aptly observed in *Mator v. Wesco Distrib, Inc.*, "the different service codes do not undermine the [plan] comparisons because they apparently overlap." All of the plans list either 'Recordkeeping fees,' 'Recordkeeping and information management (computing, tabulating, data processing),' or both." *See id.*, 102 F.4th 172, 186 (3d Cir. 2024).

83.    The following charts shows the same is true with regard to the Smith & Nephew's comparator plans with regard to both asset size and participant size. Each list recordkeeping fees (Code 64), "Recordkeeping and information management (computing, tabulating, data processing) (Code 15), or both, just as in *Mator:*

| Plan | Service / Compensation Codes |
|---|---|
| The Terracon 401(K) and ESOP Plan | 15, 26, 50, 64 |
| Cook Children's Health Care System Retirement Plan | 60, 64, 65, 71 |
| Operating Engineers Local 66 Annuity and Savings Fund | 15, 64 |
| Expeditors International of Washington, Inc. 401(K) Plan | 15, 21, 25, 28, 37, 38, 49, 50, 52, 59, 62, 64, 65 |
| Universal Music Group 401(K) Plan | 15, 16, 25, 37, 52 |
| Henry Ford Health System Retirement Savings Plan | 15, 37, 50, 59, 64 |
| The Boston Consulting Group, Inc. Employees' Savings Plan and Profit Sharing Retirement Fund | 15, 25, 37, 52, 99 |

84. Consequently, the RKA analysis focused on recordkeeping (Codes 15 and 64) provided by Fidelity and other plan recordkeepers is an appropriate method to make an apples-to-apples comparison, and then infer a flawed fiduciary process from the disparity in RKA fees.

85. In short, "[a]t this stage, the record does not reveal the codes' precise meanings, nor whether all plans define the codes consistently. But given that all the plans received some portion of an overlapping constellation of recordkeeping services, the comparisons help nudge the [plaintiffs'] claims across the line from possible to plausible." *Mator*, 102 F.4th at 186.

86. The investment options selected by plan fiduciaries also often have a portion of the total expense ratio allocated to the provision of recordkeeping performed by the recordkeepers on behalf of the investment manager.

87. Recordkeepers often collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund. These fees are known as "revenue sharing" or "indirect compensation."

88. The Smith & Nephew Plan paid both direct and indirect RKA fees during the Class Period to Fidelity.

89. The comparator plans either paid direct and indirect RKA fees or only direct RKA fees, but indirect compensation was taken into consideration for both the Plan and the comparator plans.

### C. Standard of Care for Prudent Fiduciaries Selecting & Monitoring Retirement Plan Service Providers

90. Prudent plan fiduciaries ensure they are paying only reasonable fees for Total RKA by engaging in an "independent evaluation," see *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 742 (2022), and soliciting competitive bids from other recordkeepers to perform the same level and quality of services currently being provided to the Plan.

91. Prudent plan fiduciaries can easily receive a quote from other RKA providers to determine if the current level of Total RKA fees is reasonable in light of the level and quality of Total RKA fees. It is not a cumbersome or expensive process.

92. It is the standard of care prevailing among industry experts to solicit competitive bids every three to five years. *See* CapTrust, *Understanding and Evaluating Retirement Plan Fees | Part*

*One: A Holistic Approach*, https://www.captrust.com/understanding-and-evaluating-retirement-plan-fees-part-one-a-holistic-approach/

93.    "[B]est practice is . . . a more formal recordkeeper search and selection process conducted approximately every three to five years. Recordkeeping and administrative fees should be evaluated and compared to plans of similar size and type that are receiving analogous services. While each plan is unique—making an apples-to-apples comparison imperfect—evaluating fees against similarly situated and sized plans provides a good reference point in helping to determine if plan fees are reasonable." *Id*.

94.    Having received bids, prudent plan fiduciaries can negotiate with their current RKA providers for a lower fee or move to a new RKA provider to provide a materially similar level and qualities of services for a more competitive reasonable fee if necessary.

95.    Prudent fiduciaries implement three related processes to prudently manage and control a plan's RKA costs. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

96.    First, a hypothetical prudent fiduciary tracks RKA provider's expenses by demanding documents that summarize and contextualize their compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

97.    Second, to make an informed evaluation as to whether a RKA provider is receiving no more than a reasonable fee for the quality and level of services provided to a plan, prudent hypothetical fiduciaries must identify all fees, including direct compensation and revenue sharing being paid to the plan's RKA provider.

98.    Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the RKA rates that are available. By soliciting bids from other RKA providers, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for the same level and quality of RKA services.

99.    Accordingly, the best way to determine the *reasonable*, as opposed to the *cheapest* or *average*, market price for a given quality and level of RKA services is to obtain competitive bids from

other providers in the market. *Hughes v. Northwestern Univ.*, 63 F.4th 615, 625-626 (7th Cir. 2023) ("*Hughes II*") (although "a fiduciary *need not constantly solicit quotes* for recordkeeping services to comply with its duty of prudence, . . . fiduciaries who fail to monitor the reasonableness of plan fees and *fail to take action to mitigate excessive fees—such as by* adjusting fee arrangements, *soliciting bids*, consolidating recordkeepers, negotiating for rebates with existing recordkeepers, or other means—may violate their duty of prudence.") (emphasis added).

100.   Prudent fiduciaries in like circumstances to the Smith & Nephew Plan would have solicited competitive bids. *See Turner*, 530 F. Supp. 3d at 136-37.

### D.   The Plan's Bundled RKA Fees Were Too High

101.   Every defined contribution plan requires recordkeeping.  There are numerous vendors that can provide high quality recordkeeping services to defined contribution plans such as the Smith & Nephew Plan. These vendors strenuously compete against each other by offering the lowest price for the best service.

102.   Defendants, as the Plan's fiduciaries, selected the RKA service providers for the Smith & Nephew Plan and controlled which investment options and investment vehicles were available in the Plan. Defendants were responsible for monitoring those service providers, and the fees they charged, on an ongoing basis.

103.   Large plans are generally able to leverage their size to obtain lower fees per participant, in part because of the economies of scale that large plans provide recordkeepers.

104.   With approximately 10,000 participants and over a billion dollars in assets during the Class Period, the Smith & Nephew Plan is one of the largest defined contribution plans in the United States.

105.   The Plan thus had the bargaining power to obtain and maintain very low fees for RKA services and had significant leverage to procure high-level RKA services at a low cost.

106.   Defendants failed to leverage the Smith & Nephew Plan's size to obtain reasonable Total RKA fees.

107.   And, for those lower prices, other very large plans receive equivalent or better RKA services than did the Smith & Nephew Plan.

108.   During the Class Period, Defendants egregiously failed to regularly monitor the Plan's Total RKA fees paid to Fidelity.

109.   During the Class Period, Defendants failed to regularly solicit quotes and/or competitive bids from RKA providers, including but not limited to Fidelity, in order to avoid paying unreasonable Total RKA fees.

110.   During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants followed a fiduciary process that was ineffective given the objectively unreasonable Total RKA fees it paid to Fidelity for at least six years, and in light of the level and quality of Total RKA services it received that were materially-similar, fungible services available through other RKA providers and provided to other very large plans.

111.   As set forth in the table below, from the years 2018 through 2022, based upon information available from Schedule C of the Plan 5500 Forms from 2018 to 2022, the Smith & Nephew Plan paid to Fidelity an effective average annual Total RKA fee of $62 per participant:

### Total Recordkeeping and Administration (Total RKA) Fees

|  | 2018 | 2019 | 2020 | 2021 | 2022 | *Average* |
|---|---|---|---|---|---|---|
| **Participants** | 8,024 | 8,879 | 8,993 | 9,560 | 9,968 | *9,085* |
| **Est. Total RKA Fees** | $528,096 | $487,268 | $516,301 | $604,380 | $673,782 | *$561,965* |
| **Est. Total RKA Per Participant** | $66 | $55 | $57 | $63 | $68 | *$62* |

112.   The table below illustrates the Total RKA fees paid in 2021 by other comparable plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, compared to the 2021 Total RKA fees paid by the Plan.

**Comparable Plans' Total RKA Fees Based on Publicly Available Information from Form 5500**
(Price calculations are based on 2021 Form 5500 information)

| Plan | Participants | Total RKA Fee | Total RKA Fee /pp | Recordkeeper |
|---|---|---|---|---|
| The Terracon 401(K) and ESOP Plan | 7,769 | $266,251 | $34 | Schwab |
| Cook Children's Health Care System Retirement Plan | 8,392 | $250,824 | $30 | Fidelity |
| Expeditors International of Washington, Inc. 401(K) Plan | 8,937 | $343,520 | $38 | T. Rowe Price |
| **Smith & Nephew U.S. Savings Plan 2021 Fee** | **9,560** | **$604,380** | **$63** | **Fidelity** |
| Operating Engineers Local 66 Annuity and Savings Fund | 10,486 | $305,305 | $29 | Newport |

113.     The Smith & Nephew Plan paid over $600,000 a year in Total RKA fees in 2021 when, based on a $32 flat fee per participant, a more reasonable amount would have been just over $300,000.

114.     The ***Smith & Nephew Plan paid twice as much than necessary*** for Total RKA in 2021 as compared to similarly-sized comparative plans receiving similar fungible and commoditized Plan services as the following chart illustrates:

**Total Recordkeeping and Administration (Total RKA) Fees**

| | 2018 | 2019 | 2020 | 2021 | 2022 | *Average* |
|---|---|---|---|---|---|---|
| **Participants** | 8,024 | 8,879 | 8,993 | 9,560 | 9,968 | *9,085* |
| **Est. Total RKA Fees** | $528,096 | $487,268 | $516,301 | $604,380 | $673,782 | *$561,965* |
| **Est. Total RKA Per Participant** | $66 | $55 | $57 | $63 | $68 | *$62* |
| **Reliable Est. of Reasonable Total RKA Fees** | $256,768 | $284,128 | $287,776 | $305,920 | $318,976 | *$290,714* |
| **Reliable Est. of Reasonable Total RKA Fees Per PP** | $32 | $32 | $32 | $32 | $32 | *$32* |
| **Est. Total RKA Losses** | $271,328 | $203,140 | $228,525 | $298,460 | $354,806 | *$271,252* |
| **Est. Total RKA Losses Per PP** | $34 | $23 | $25 | $31 | $36 | *$30* |

115.     From the years 2018 through 2022, the graph below illustrates the Total RKA fees paid by other comparable plans of similar sizes with similar amounts of money under management to their recordkeepers, receiving a similar level and quality of services, compared to the 2021 Total RKA fees paid by the Smith & Nephew Plan, with the white data points representing RKA fees that recordkeepers offered to (and were accepted by) comparable Plans:



116.    The trend line in the graph above represents an effective per participant Total RKA fee rate for a given number of participants around which a plan fiduciary would expect to obtain had the Plan fiduciary followed the standard of care to ensure the Plan paid only reasonable fees for materially similar RKA services.

117.    Prior to the Class Period, the fees recordkeepers were willing to accept for RKA services had materially stabilized such that fees the recordkeepers accepted in 2021 for RKA services were consistent with the fees recordkeepers would accept for all of 2018 to 2022. *See The Economics of Providing 401(k) Plans: Services, Fees, and Expenses, 2020*, ICI Research Perspective, at 4 (June 2021).

118.    The Total RKA fees paid by similarly-sized comparable plans provide evidence that the Total RKA fees paid by the Smith & Nephew Plan for materially similar commoditized RKA services were excessive and unreasonable, and leads to a reasonable inference that Smith & Nephew Plan fiduciaries employed an imprudent fiduciary process.

119.    The Total RKA fees paid by each of the comparable plans provides evidence that the Smith & Nephew Plan paid excessive fees because there are no RKA services offered by any

recordkeeper that would warrant or reasonably explain the disparity between the Total RKA fees paid by the Smith & Nephew Plan and the Total RKA fees that other comparable plans paid for materially similar RKA services.

120.     The Plan's Total RKA fee rate range of $55/pp to $68/pp from 2018 to 2022 can be compared to the much lower Total RKA fee rates of other comparable plans.

121.     Each of the comparator plans identified below are among the closest 6/100th of 1% (0.06%) of all the defined contribution plans covered by ERISA.

122.     More specifically, there were around 690,128 plans in 2021 and only 404 plans had between 7,769 and 10,468 participants with a balance greater than zero at year-end. 689,724 plans or 99.94% of all plans have either less than 7,769 or more than 10,468 participants.

123.     Plans containing between 7,769 and 10,468 participants are among the most meaningful and appropriate to use as similarly-situated, comparable plans, and include the following:

124.     **Terracon 401(k) and ESOP Plan** ("Terracon"): The comparable fee rate of $34 per is comprise of $34/pp of direct compensation paid to Schwab Retirement Plan Services for providing RKA services disclosed on the 2021 Form 5500 Schedule C. Schwab did not receive any indirect compensation as disclosed in Part 1, Line 2(e) of Schedule C.

125.     The Terracon Plan is a meaningful benchmark because at the end of 2021, the Terracon Plan had around 7,769 participants, less than the 9,560 participants in the Plan in 2021. The costs to a recordkeeper for providing Total RKA services to a plan with more than 3,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the Terracon Plan and the Smith & Nephew Plan and any service differentials cannot explain the disparity between the fees paid by the Terracon Plan and the fees paid by the Smith & Nephew Plan.

126.     For example, the disparity of $29 per participant between the $34 per participant Total RKA rate for the Terracon Plan's fee compared to the Total RKA rate of $63 per participant paid by the Smith & Nephew Plan in 2021 represents over $270,000 annually and would conservatively represent more than 5,400 hours of RKA services in one year provided by employees of the recordkeeper. There

are no special or different Total RKA services provided to any plan with between around 7,500 and 10,500 participants that would reasonably warrant incremental additional fees of over $270,000 for plans with similar numbers of participants.

127.    All else being equal, if the Terracon Plan can obtain a fee of $34 per participant with 7,769 participants, then the Smith & Nephew Plan, which ranged in participants from around 8,024 to around 9,968 throughout the Class Period, should be able to obtain a fee of around $32 per participant, *or lower*, as indicated by the trend line generated from the Total RKA Fee rates paid by all the comparable plans.

128.    The Terracon Plan is one of the closest 0.06% (six hundredth of 1%) of all defined contribution plans governed by ERISA. The massive disparity between the Total RKA fees paid by the Terracon Plan and the Smith & Nephew Plan's estimated effective Total RKA fee rate of around $63 per participant, viewed holistically and in conjunction with the evidence of the fees paid by all the other comparable plans, leads to a plausible inference that the Plan paid excessive and unreasonable Total RKA fees and the Plan's fiduciary process was imprudent.

129.    **Cook Children's Health Care System Retirement Plan** ("Cook"): The comparable fee rate of $27 per participant is comprised of $26.41/pp of direct compensation paid to Fidelity from the 2021 Form 5500 Schedule C and a calculation of $3.48 of indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i by the revenue sharing rates disclosed on Line 3 of Part I of Schedule C.

130.    The Cook Plan is a meaningful benchmark because at the end of 2021, the Cook Plan had around 8,392 participants, less than the 9,560 participants in the Plan in 2021. The costs to a recordkeeper for providing Total RKA services to a plan with more than 3,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the Cook Plan and the Smith & Nephew Plan and any service differentials cannot explain the disparity between the fees paid by the Cook Plan and the fees paid by the Smith & Nephew Plan.

131.    For example, the disparity of $33 per participant between the $30 per participant Total RKA rate for the Cook Plan's fee compared to the Total RKA rate of $63 per participant paid by the Smith & Nephew Plan in 2021 represents over $310,000 annually and would conservatively represent more than 6,200 hours of RKA services in one year provided by employees of the recordkeeper. There are no special or different Total RKA services provided to any plan with between around 7,500 and 10,500 participants that would reasonably warrant incremental additional fees of over $310,000 for plans with similar numbers of participants.

132.    All else being equal, if the Cook Plan can obtain a fee of $30 per participant with 8,392 participants, then the Smith & Nephew Plan, which ranged in participants from around 8,024 to around 9,968 throughout the Class Period, should be able to obtain a fee of around $32 per participant, *or lower*, as indicated by the trend line generated from the Total RKA Fee rates paid by all the comparable plans.

133.    The Cook Plan is one of the closest 0.06% (six hundredth of 1%) of all defined contribution plans governed by ERISA. The massive disparity between the Total RKA fees paid by the Cook Plan and the Smith & Nephew Plan's estimated effective Total RKA fee rate of around $63 per participant, viewed holistically and in conjunction with the evidence of the fees paid by all the other comparable plans, leads to a plausible inference that the Plan paid excessive and unreasonable Total RKA fees and the Plan's fiduciary process was imprudent.

134.    **Expeditors International of Washington, Inc. 401(k) Plan** ("Expeditors"): The comparable fee rate of $38 per participant is comprised of $38/pp of direct compensation paid to T. Rowe Price from Form 5500 Schedule C and a calculation of $0/pp of indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i times the revenue sharing rates disclosed on Line 3 of Part I of Schedule C.

135.    The Expeditors Plan is a meaningful benchmark because at the end of 2021, the Expeditors Plan had around 8,937 participants, less than the 9,560 participants in the Plan in 2021. The costs to a recordkeeper for providing Total RKA services to a plan with more than 3,000 participants

are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the Expeditors Plan and the Smith & Nephew Plan and any service differentials cannot explain the disparity between the fees paid by the Expeditors Plan and the fees paid by the Smith & Nephew Plan.

136.    For example, the disparity of $25 per participant between the $38 per participant Total RKA rate for the Expeditors' fee compared to the Total RKA rate of $63 per participant paid by the Smith & Nephew Plan in 2021 represents over $230,000 annually and would conservatively represent more than 4,600 hours of RKA services in one year provided by employees of the recordkeeper. There are no special or different Total RKA services provided to any plan with between around 7,500 and 10,500 participants that would reasonably warrant incremental additional fees of over $230,000 for plans with similar numbers of participants.

137.    All else being equal, if the Expeditors Plan can obtain a fee of $38 per participant with 8,937 participants, then the Smith & Nephew Plan, which ranged in participants from around 8,024 to around 9,968 throughout the Class Period, should be able to obtain a fee of around $32 per participant, *or lower*, as indicated by the trend line generated from the Total RKA Fee rates paid by all the comparable plans.

138.    The Expeditors Plan is one of the closest 0.06% (six hundredth of 1%) of all defined contribution plans governed by ERISA. The massive disparity between the Total RKA fees paid by the Expeditors and the Smith & Nephew Plan's estimated effective Total RKA fee rate of around $63 per participant, viewed holistically and in conjunction with the evidence of the fees paid by all the other comparable plans, leads to a plausible inference that the Plan paid excessive and unreasonable Total RKA fees and the Plan's fiduciary process was imprudent.

139.    **Operating Engineers Local 66 Annuity and Savings Fund** ("Operating Engineers"): The comparable fee rate of $29 per participant is comprised of $29/pp of direct compensation paid to Newport from the 2021 Form 5500 Schedule C and no indirect compensation.

140.    The Operating Engineers Plan is a meaningful benchmark because at the end of 2021, the N Operating Engineers Plan had around 10,486 participants, slightly more than the 9,560

participants in the Plan in 2021. The costs to a recordkeeper for providing Total RKA services to a plan with more than 3,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the Operating Engineers Plan and the Smith & Nephew Plan and any service differentials cannot explain the disparity between the fees paid by the Operating Engineers Plan and the fees paid by the Smith & Nephew Plan.

141.    For example, the disparity of $34 per participant between the $29 per participant Total RKA rate for the Operating Engineers' fee compared to the Total RKA rate of $63 per participant paid by the Smith & Nephew Plan in 2021 represents over $320,000 annually and would conservatively represent more than 6,400 hours of RKA services in one year provided by employees of the recordkeeper. There are no special or different Total RKA services provided to any plan with between around 7,500 and 10,500 participants that would reasonably warrant incremental additional fees of over $320,000 for plans with similar numbers of participants.

142.    All else being equal, if the Operating Engineers Plan can obtain a fee of $29 per participant with 10,486 participants, then the Smith & Nephew Plan, which ranged in participants from around 8,024 to around 9,968 throughout the Class Period, should be able to obtain a fee of around $32 per participant, *or lower*, as indicated by the trend line generated from the Total RKA Fee rates paid by all the comparable plans.

143.    The Operating Engineers Plan is one of the closest 0.06% (six hundredth of 1%) of all defined contribution plans governed by ERISA. The massive disparity between the Total RKA fees paid by the Operating Engineers Plan and the Smith & Nephew Plan's estimated effective Total RKA fee rate of around $63 per participant, viewed holistically and in conjunction with the evidence of the fees paid by all the other comparable plans, leads to a plausible inference that the Plan paid excessive and unreasonable Total RKA fees and the Plan's fiduciary process was imprudent.

144.    In summary, the disparity between the Total RKA fees paid by the Smith & Nephew Plan and the Total RKA fees paid by the comparable plans identified above cannot be plausibly explained by immaterial service disparities described on 5500 Forms or elsewhere because there are

no material differences in the Total RKA services provided to plans as large as the Smith & Nephew Plan and the comparable plans.

145.   The Plan recordkeeper market is competitive with equally capable recordkeepers who can provide comparable services for less.

146.   The tables and graphs above illustrate that the Plan paid Total RKA fees to Fidelity of between $55 and $68 per participant which is much higher than the Total RKA fees paid by the other comparable plans from 2018-2022.

147.   The disparity between the fee rates of the comparable plans based on the amount of participants in each of the plans and the reliable estimate based on the trend line created by the comparable plans fee rates is $5 per participant or less and is plausibly explained by minor variations in negotiation tactics and circumstances among the fiduciaries of the comparable plans and the various recordkeepers.

148.   Based on the Smith & Nephew Plan's features, the commoditized and fungible nature of the Total RKA services provided by Fidelity, the number of participants in the Plan (approximately 10,000), and the recordkeeping market, $32 was the reasonable per participant fee.

149.   From 2018 to 2022, an unreasonable disparity of $30 per participant for Plan Total RKA (premium of 100%) existed.

150.   The Smith & Nephew Plan fees were therefore excessive relative to the RKA services rendered by Fidelity.

151.   From the years 2018 through 2022, had Defendants been acting prudently, the Plan actually would have paid significantly less than an average of approximately $561,965 per year in Total RKA fees, which equated to an effective average of approximately $62 per participant per year.

152.   From the years 2018 through 2022, the Plan additionally cost its participants on average approximately $271,252 per year in additional Total RKA fees, which equates to on average approximately $32 per participant per year.

153.   From the years 2018 to 2022, and because Defendants did not act with prudence, and as compared to other plans of similar sizes and with a materially similar level and quality of fungible and

commoditized services, the Plan actually cost its participants a minimum amount of approximately **$1,356,259** in unreasonable and excessive Total RKA fees.

154.   From the years 2018 to 2022, because Defendants did not act prudently, and as compared to other Plans of similar sizes and with a materially similar level and quality of fungible and commoditized services, the Smith & Nephew Plan caused Plan participants to suffer losses (when accounting for compounding percentages/lost market investment opportunity) a cumulative amount in excess of **$1,406,579** in Total RKA fees.

155.   Although Defendants utilized Plan forfeitures to pay Total RKA for Plan participants in the amount that averaged $62 per year, only $32 per year should have been utilized for that purpose.

156.   Consequently, **$1,406,579** in unreasonable and excessive Total RKA fees could have been used to pay other Plan expenses rather than being used imprudently for off-setting unreasonable Total RKA fees.

157.   On the other hand, it is not possible to find comparator plans that have simultaneously both similar number of participants and similar asset sizes.

158.   "Even if a comparator has similar total assets, defendants will complain that it has too many or too few participants, and even if a comparator has similar total participants, defendants will complain that it has too many or too few assets . . . . plaintiffs suing exceptionally large or exceptionally small plans would face a nearly insurmountable pleading hurdle." *Dionicio v. U.S. Bancorp*, 2024 WL 1216519, at *3 (D. Minn. Mar. 21, 2024).

159.   Total RKA calculations based on similar ***amount of assets*** as of a specified date (December 31, 2021) establish that Defendants significantly overpaid Fidelity for Total RKA services at a rate on average of $63 per participant per year with $1,359,559,660 in assets while comparator plans paid at a rate on average of $30 per participant per year with similar amounts of assets under management:

| Plan | Assets | Total RKA Fee | Total RKA Fee /pp | Recordkeeper |
|---|---|---|---|---|
| The Terracon 401(K) and ESOP Plan | $776,112,911 | $266,251 | $34 | Schwab |
| Universal Music Group 401(K) Plan | $1,230,051,503 | $138,263 | $22 | Vanguard |
| Henry Ford Health System Retirement Savings Plan | $1,893,394,912 | $522,251 | $22 | Great-West |
| The Boston Consulting Group, Inc. Employees' Savings Plan and Profit Sharing Retirement Fund | $1,912,504,813 | $502,928 | $42 | Vanguard |
| | | Average | $30 | |

160.   The result of this asset-based comparison between similarly-sized plans receiving the same commoditized and fungible Total RKA services is that there is disparity of $33 per participant (*an over 111% premium*) between what Smith & Nephew Plan participants paid in 2021 as compared to what other plan participants paid with similar amount of plan assets during this same time period.

161.   The Smith & Nephew Plan additionally cost its participants on average approximately $289,421 per year in additional RKA fees when compared to plans with similarly amounts of assets under management, which equates to on average approximately $32 per participant per year.

162.   The Smith & Nephew Plan cost its participants a total minimum amount of approximately **$1,447,107** in Total RKA fees from 2018 to 2022 on an asset-basis.

163.   The Smith & Nephew Plan actually cost its participants (when accounting for compounding percentages) a total, cumulative amount in excess of **$1,500,446** in Total RKA fees from 2018-2022 when comparing plans with similar services and similar assets under management.

164.   Whether looking at Total RKA fees based on a participant-size comparisons or at Total RKA fees based on an asset-size comparisons, Defendants failed to take advantage of the Plan's very large size to timely negotiate lower Total RKA fees with Fidelity for Plan RKA services.

165.   Defendants could have obtained materially similar Total RKA services for much less from other recordkeepers or from Fidelity itself had it only leveraged its massive size.

166.   It can be plausibly inferred from the unreasonably high fees it paid for RKA services during the Class Period that Defendants did not conduct an effective or competitive solicitation of bids for RKA services, and failed to take actions that would have reduced such fees.

167.   Plaintiffs and Class Members paid all of these excessive Total RKA fees and suffered substantial injuries to their Plan accounts as a result.

168.   During the entirety of the Class Period, and by failing to recognize that the Smith & Nephew Plan and its participants were being charged excessive Total RKA fees and by failing to take effective remedial actions, Defendants breached their fiduciary duty of prudence to Plaintiffs and to other Plan participants, causing millions of dollars of harm to Plaintiffs and Class Member's retirement accounts.

**E.      Fidelity/SA Charged Excessive Managed Account Service Fees**

169.   The Plan Fiduciaries also made a Managed Account services (hereafter "MAS") provided by its recordkeeper ("Fidelity") available to Plan Participants through its wholly-owned subsidiary, Strategic Advisors, Inc. ("SA").

170.   MAS are a service provided to retirement plan participants that purport to provide a personalized asset allocation to an individual participant in contrast to a target date fund ("TDF"), which provides the same asset allocation to all participants that are expected to retire within roughly the same five-year period.

171.    MAS are a discretionary portfolio management service for a fee that makes investment decisions for the participant within the confines of a plan and its fund options.

172.   Most plan participants are expected to receive a TDF-like experience with MAS. *See* Aon, *Are Managed Accounts More Efficient Than Target Date Funds?* (2020).

173.   Without personalization provided by Plan participants through investment questionnaire or similar mechanisms to customize their portfolios, managed account services are fundamentally the same as TDFs, the QDIA favored by almost all large plans.

174.   Many MAS providers build simple portfolios with less diversification than the most "vanilla" TDFs. *Id.*

175.    MAS portfolios are often meaningfully more expensive and not meaningfully more effectively diversified. There is no meaningful difference in the level or the personalization of the diversification. *Id.*

176.    Recordkeepers can deliver many of the benefits they claim to deliver through managed accounts via other services that are provided as part of the bundled recordkeeping offering for no additional fee, such as TDFs with multiple glide paths. *Id.*

177.    MAS fees often account for a significant portion of administrative fees. The portion of MAS fees paid to the recordkeeper is often not disclosed transparently. The lack of transparency makes it hard to determine whether the MAS provides value. *See* Aon, *Can You Truly Evaluate Managed Accounts Through Marketing's Rose-Colored Glasses?* (2019).

178.    For example, Fidelity, through SA, is one of the largest MAS providers. An analysis of defined contribution plans required to file the Form 5500 from 2014 through 2022 reveals that by the end of 2014, Fidelity had 686 recordkeeping plans that had adopted its MAS, but by the end of 2022, Fidelity had 2,659 recordkeeping plans that had adopted its MAS, a growth of almost 288%.



179.    In contrast, Fidelity's total growth of recordkeeping clients was just under 38% over that same period.

180.     Similarly, as illustrated in the graph below, Fidelity's direct compensation per plan from the subset of 382 Fidelity recordkeeping plans that consistently used its MAs from 2014 through 2022 grew 282%.

181.     In contrast, Fidelity's direct compensation from the subset of 4,515 Fidelity recordkeeping plans that consistently did *not* use its MAS from 2014 through 2022 grew only 145%.

182.     In other words, Fidelity's revenue grew roughly twice as fast among plans using the MAS compared to those not using the MAS. As a result, Fidelity has had a powerful financial incentive to sell its managed account services to retirement plan fiduciaries.



183.     Yet, TDFs outperformed MAS in median, upside, and downside cases. See Fidelity Solutions, *2018 Professional Investment Assistance Report: The Impact of Managed Accounts and Target Date Funds in Defined Contribution Plans 2007-2016*.

184.     According to the July 8, 2024, Required Disclosure Information for the Plan pursuant to ERISA Section 404(a)(5), the Smith & Nephew Plan fiduciaries agreed to pay SA an effective fee rate of 0.51% for all level of Plan assets held by participants for MAS.

185.     By 2022, Fidelity's MAS fees had grown to about 38% of the total compensation Fidelity and its wholly-owned subsidiary SA earned from providing MAS to the Smith & Nephew Plan and totaling over $400,000 in unreasonable and unnecessary fees that did not add any value to the Plan.

186.   Under the minimum standard of care for prudent plan fiduciaries, there is no reasonable basis to conclude that having Plan participants pay Fidelity/SA MAS fee rate of 0.51% would result in a net benefit to the Plan participants using the service or to the Plan in aggregate on a net basis.

187.   A plan fiduciary must monitor the total administrative fees, including managed account compensation, it pays to the MAS service provider by regularly conducting an independent evaluation of those fees to ensure that such administrative fees are reasonable and remove the the MAS if those fees are unreasonable or imprudent.

188.   During the Class Period, Defendants egregiously failed to regularly monitor the administrative fees, including the MAS compensation, paid to Fidelity and SA.

189.   During the Class Period, Defendants failed to consider other alternatives to the SA MAS, including TDFs, in order to avoid having Plan participants pay excessive and unreasonable administrative fees.

190.   Without personalization of MAS provided by Plan participants through investment questionnaires, MAS rely on age primarily just like TDFs, except they are many magnitudes more expensive when it comes to administrative fees.

191.   Plaintiff Cooley's experience is representative of many Plan participants who were defaulted into the SA MAS in the Smith & Nephew Plan without their knowledge, who did not provide any personalization to customize their MA solution to provide additional value, and did not have the financial literacy to understand they were being charged unnecessary administrative fees in the form of MAS fees, all the while losing retirement monies unnecessarily.

192.   During the class period, and unlike a hypothetical prudent fiduciary, Defendants followed a fiduciary process that was ineffective given the objectively unreasonable administrative fees associated with MAS compensation it paid to SA, and in light of the lack of value of MAS given

the disengaged, financially illiterate, and uninformed nature of most Smith & Nephew Plan participants who were defaulted into the SA MAS.

193.   The Plan Committee, as Plan fiduciaries, should have compared MAS to TDFs through periodic reviews to determine whether given cost, risk, performance, and other pertinent factors (like participants' disengagement) that establishing the MA as a Plan service was prudent.

194.   According to the Smith & Nephew Plan's July 8, 2024, Required Disclosure Information pursuant to ERISA Section 404(a)(5), in addition to "recordkeeping fee" of $39 per participant per year (not including other administrative fees paid to Fidelity), the SA MAS costs Smith & Nephew Plan participants an annual fee of 0.51% of assets under management.

195.   So, for instance, Plaintiff Cooley, from April 1, 2024 through June 30, 2024, paid $471.13 in fees to Fidelity and SA for MAS.

196.   In comparison, there are no administrative fees associated with TDFs and Plan participants only pay the $39 for recordkeeping fee per year (or about $63 per year for Total RKA).

197.   The appropriate comparison is not managed account versus managed account with regard to a comparison of fees associated with the MAS or services provided by those MAS, but instead whether a TDF should have been selected instead of *any* MAS.

198.   The selection of the MAS as a Plan option was therefore imprudent without any evidence that a fiduciary process was followed or that these additional MAS fees provided any value to Plan participants who did not even know they were defaulted into the Plan, like Plaintiff Cooley, and who did not provides any personalized information to permit more investment individualization.

199.   The comparable plans, which utilized only TDFs, are examples of a choice that a prudent fiduciary could have made had they performed the required fiduciary analysis and determined that establishing MAS as a Plan option with higher fees was imprudent when TDFs could have provided similar asset allocations purposes as MAS for Plan participants at a much lower cost.

200.   As set forth in the table below, from the years 2018 through 2022, based upon information provided in Participant Fee Disclosures, Audited Financial Statements attached to 5500 Forms, and/or in participant quarterly account statements, the Smith & Nephew Plan paid an effective average annual rate of $97 per participant for administrative fees (which is the sum of Total RKA fees and MAS compensation):

**Total Recordkeeping and Administration Fees
Plus Managed Account Compensation (Total RKA+MA)**

| | 2018 | 2019 | 2020 | 2021 | 2022 | *Average* |
|---|---|---|---|---|---|---|
| Participants | 8,024 | 8,879 | 8,993 | 9,560 | 9,968 | *9,085* |
| Est. Total RKA+MA | $751,218 | $747,428 | $818,876 | $1,011,077 | $1,085,464 | *$882,813* |
| Est. Total RKA+MA Per Participant | $94 | $84 | $91 | $106 | $109 | *$97* |
| Reliable Est. of Reasonable Total RKA+MA | $256,768 | $284,128 | $287,776 | $305,920 | $318,976 | *$290,714* |
| Reliable Est. of Reasonable Total RKA+MA Per PP | $32 | $32 | $32 | $32 | $32 | *$32* |
| Est. Total RKA+MA Losses | $494,450 | $463,300 | $531,100 | $705,157 | $766,488 | *$592,099* |
| Est. Total RKA+MA Losses Per PP | $62 | $52 | $59 | $74 | $77 | *$65* |

201.   The table below illustrates the administrative fees paid by other similarly-situated plans, providing a comparable level and quality of administrative services in 2021, but having TDFs alone and no MAS like the Smith & Nephew Plan:

**Comparable Plans' Total RKA+MA Based on Publicly Available Information from Form 5500**
(Price calculations are based on 2021 Form 5500 information)

| Plan | Participants | Total RKA+MA | Total RKA+MA /pp | Recordkeeper |
|---|---|---|---|---|
| The Terracon 401(K) and ESOP Plan | 7,769 | $266,251 | $34 | Schwab |
| Cook Children's Health Care System Retirement Plan | 8,392 | $250,824 | $30 | Fidelity |
| Expeditors International of Washington, Inc. 401(K) Plan | 8,937 | $343,520 | $38 | T. Rowe Price |
| **Smith & Nephew Plan 2021 Fee** | **9,560** | **$1,011,077** | **$106** | **Fidelity** |
| Operating Engineers Local 66 Annuity and Savings Fund | 10,486 | $305,305 | $29 | Newport |



202.   The comparable plans above are not used to show that RKA fees are excessive, rather that the MAS fees were unnecessary and unreasonable.

203.   The Smith & Nephew Plan's average recordkeeping rate should have been $32 per year on average during the relevant class period for Total RKA, but the use of the SA MAS, which was unnecessary for asset allocation purposes for Plan participants, generated an additional $74 per participant per year for Fidelity/SA during the Class Period.

204.   If the Smith & Nephew Plan had instead used TDFs for asset allocation purposes and no MAS, the Total RKA fee should have been $32 per participant per year.

205.   The Smith & Nephew Plan additionally cost its participants average approximately $592,099 per year in additional Total RKA and managed account fees, which equates to on average approximately $65 per participant per year from 2018 to 2022.

206.   By using the SA MAS, instead of relying on TDFs like the comparator plans, the Smith & Nephew Plan cost its participants (when accounting for compounding percentages) a total, cumulative amount in excess of **$3,025,278** through December 31, 2022.

207.   During the entirety of the class period, and had Defendants engaged in regular and/or reasonable examination and competitive comparison of the total administrative fees it paid to

Fidelity/SA, including MAS account compensation, it would have realized that the Plan was compensating Fidelity/SA unreasonably and inappropriately for its size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiffs and other Plan participants.

208.   During the entirety of the class period and by failing to recognize that the Plan and its participants were being charged much higher Plan administrative fees than they should have been and/or by failing to take effective and timely remedial actions including replacing the imprudent MAS asset allocation option with prudent TDFs and auto-escalation options, Defendants breached their fiduciary duty of prudence to Plaintiffs and to other Plan participants, causing tens of millions of dollars of harm to Plaintiffs and Class Member's retirement accounts.

F.     **Smith & Nephew's Imprudent, Disloyal, and Prohibited Use of Plan Forfeitures**

209.   The Smith & Nephew Plan is funded by a combination of wage withholdings by Plan participants and Company matching and non-elective contributions, each of which is deposited into the Plan's trust fund.

210.   Upon their deposit into the Plan's trust fund, all participant contributions and Company contributions become assets of the Plan.

211.   Forfeitures were utilized for both employer contributions and administrative fees in the Smith & Nephew Plan during the Class Period.

212.   As an individual account, defined contribution retirement plan, the Smith & Nephew Plan "provides for an individual account for each participant and for benefits solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses, and any forfeiture of accounts of other participants which may be allocated to such participant's account." 29 U.S.C. § 1002(34).

213.   Participants are fully vested in their salary deferrals plus actual earnings thereon. Vesting in Employer contributions is based on years of qualified service with and vest fully after four years of service, according to the Plan SPD.

214.   Forfeitures are the nonvested portion of a participant's account that is lost upon termination of employment.

215.    The audited financials for the Smith & Nephew Plan during the Class Period all state: "Forfeited balances of terminated participants' non-vested accounts are used to reduce future Company contributions or to pay administrative expenses."

216.    The audited financials also state that "[i]n 2022 and 2021, forfeitures . . . were used to offset current year employer contributions and administrative fees."

217.    It appears from Plaintiffs' quarterly account statements that Plaintiffs are not paying any RKA fees, meaning that unallocated forfeitures were used to offset Plan administrative fees.

## Forfeitures Used for Employer's Benefit

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|
| *Compounding Percentage (Plan Return)* | | 23.55% | 17.39% | 14.72% | -18.19% | 21.87% |
| *Forfeitures Used by Plan to pay for Administrative Expenses and offset current year employer contributions* | $3,239,719 | $2,886,658 | $3,395,221 | $5,122,560 | $3,670,182 | |
| *Estimated Administrative Expenses Paid with Forfeitures* | $606,781 | $616,150 | $610,140 | $783,327 | $770,287 | |
| Forfeitures Used by Plan to offset Employer Contributions | $2,632,938 | $2,270,508 | $2,785,081 | $4,339,233 | $2,899,895 | |
| **Cumulative Compounded Reduce Employer Contribution Losses** | **$2,632,938** | **$5,523,564** | **$9,269,369** | **$14,973,191** | **$15,148,971** | **$18,462,199** |

Sources:  2018 Form 5500, Page 28 of 50 | 2019 Form 5500, Page 28 of 52 | 2020 Form 5500, Page 28 of 50 | 2021 Form 5500, Page 30 of 54 | 2022 Form 5500, Page 32 of 56

218.    Losses from misallocation of Plan forfeitures for Smith & Nephew benefits are calculated in the chart above by taking the full amount of the forfeiture and reducing that amount by the administrative expenses that were paid with Plan forfeitures, including all direct compensation on Schedule C except for Strategic Advisors for MAS, as those MAS fees are extracted from individual Plan participants accounts.

219.    The Plan Committee allocated the forfeited funds, as shown in the chart above, to reduce both the Plan's administrative expenses and to offset Smith & Nephew's own obligation to make future company contributions to the Plan.

220.    Thus from 2018-2022, Defendants used forfeited funds to reduce the Company's contributions to the Plan by at least **$15,148,971**, which compounded over the relevant time period is **$18,462,199**.

221.   ERISA explicitly requires Plan fiduciaries to discharge their duties "solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

222.   Furthermore, in deciding to use Plan forfeiture to benefit itself as far as reducing future company contributions through use of Plan assets, Defendants acted with a conflict of interest in administering the Plan and in managing and disposing of the Plan's assets. Such self-dealing violates the ERISA fiduciary prohibited transaction rules under 29 U.S.C. § 1106(b).

223.   Although Defendants used the forfeited funds to pay Plan administrative expenses, they could have further reduced or eliminated the amounts charged to Plan participants and paid other types of Plan costs.

224.   By not utilizing the forfeited funds in the Plan exclusively for the Plan participants' benefit, and by using these Plan assets to reduce Smith & Nephew's obligation to making contributions to the Plan, Defendants violated their duty of loyalty and prohibited transaction rules under ERISA.

225.   It would have been in the best interests of the Plan and its participants for Smith & Nephew to use the forfeiture amounts to further defray the Plan's administrative expenses, rather than to reduce Smith & Nephew's own contribution obligation, which amounted to self-dealing on Smith & Nephew's part as a fiduciary with plan assets.

226.   In so doing, Defendants breached their fiduciary duty of loyalty to the Plan, engaged in fiduciary prohibited transactions, and cost the Plaintiffs and class members tens of millions of dollars in lost Plan assets that should have been used exclusively for Plan costs.

### G.   Class Action Allegations

227.   Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(1), or, in the alternative, 23(b)(2) of the Federal Rules of Civil Procedure on behalf of the following class of similarly situated persons (the Class):

All participants in and beneficiaries of the Smith & Nephew 401(k) Plan at any time from the earlier of (i) six years before the filing of this action, or (ii), in the event the Court determines that Defendants have concealed the facts and circumstances that would have apprised Plaintiffs and the Class of the existence of Defendants' breaches through the date of judgment.

228.   The members of the Class are so numerous that joinder of all members is impracticable. At all relevant times, the number of class members was approximately ten thousand (10,000) or more.

229.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the class.  Among such questions are:

i.   Whether Defendants failed in their fiduciary duties with respect to the administration, management and supervision of recordkeeping providers;

ii.   Whether Defendants failed in their fiduciary duties to act as prudent financial managers and to minimize plan administrative and managed account fees;

iii.   Whether Defendants failed in their fiduciary duties, and engaged in prohibited transactions with plan assets, by using forfeitures to save Smith & Nephew money rather than further defray Plan expenses; and,

iv.   Whether Defendants' breaches of fiduciary duties caused losses to the Plan and its participants, and if so, in what amount.

230.   Plaintiff's claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiffs were participants during the time period at issue and all participants in the Plan were harmed by Defendants' misconduct.

231.   Plaintiff will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because they were participants in the Plan during the class period, have no interest that conflicts with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent lawyers to represent the Class.

232.   Class certification of Plaintiffs' claims is appropriate pursuant to Fed. R. Civ. P. 23(b)(1) because the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Defendants, and/or because adjudications with respect to individual Class members would as a practical matter be dispositive of the interests of non-party Class members.

233.    In the alternative, certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

234.    Plaintiffs' attorneys have substantial and varied experience in complex ERISA and class action litigation and will adequately represent the Class.

235.    The claims brought by the Plaintiffs arise from fiduciary breaches and prohibited transactions as to the Plan in its entirety and does not involve mismanagement of individual accounts.

236.    The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in the individual participants' Plan.

237.    Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

238.    Under ERISA, an individual "participant" or "beneficiary" is distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

239.    Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

**FIRST CLAIM FOR RELIEF**
**Breach of Duty of Prudence Under ERISA, as Amended**
**(Plaintiffs, on Behalf of Themselves and Class,**
**Against Defendant Plan Committee – Total RKA Fees)**

240.    Plaintiffs restate the above allegations as if fully set forth herein.

241.    Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

242.    29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Defendants in its administration of the Plan.

243.   Defendants, as fiduciaries of the Plan, are responsible for selecting a recordkeeper that charges reasonable Total RKA fees.

244.   During the Class Period, Defendants had a fiduciary duty to do all of the following: ensure that the Plan's Total RKA fees were reasonable; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

245.   During the Class Period, Defendants breached their fiduciary duty of prudence to Plan participants, including to Plaintiffs, by failing to: ensure that the Plan's Total RKA fees were reasonable, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

246.   During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's recordkeeper, Fidelity, to make sure it was providing the Total RKA services at reasonable cost, given the highly competitive, commodified and fungible market surrounding recordkeeping and the enormous bargaining power the Plan had to negotiate the best fees, and remove Fidelity if it provided RKA services at objectively unreasonable fee levels.

247.   During the Class Period, Defendants breached their duty to Plan participants, including to Plaintiffs, by failing to employ a prudent process and by failing to evaluate the cost of the Plan's recordkeeper critically or objectively in comparison to other recordkeeper options.

248.   Defendants failed to discharge its duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

249.   As a result of Defendants' breach of their fiduciary duties of prudence with respect to the Plan, the Plaintiffs and Plan participants suffered millions of dollars in unreasonable and unnecessary monetary losses, even though Smith & Nephew covered plan administration costs with Plan forfeitures, since such forfeitures should have been used to further defray Plaintiffs and Plan participant's administrative costs.

250.   Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Smith & Nephew Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief as set forth in the Prayer for Relief.

## SECOND CLAIM FOR RELIEF
### Failure to Adequately Monitor Other
### Fiduciaries under ERISA, as Amended
### (Plaintiffs, on Behalf of Themselves and Class, Against
### Defendants Smith & Nephew and Board – Total RKA Fees)

251.   Plaintiffs restate the above allegations as if fully set forth herein.

252.   Defendants Smith & Nephew and Board had the authority to appoint and remove members or individuals responsible for Plan Total RKA fees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

253.   In light of this authority, Defendants Smith & Nephew and Board had a duty to monitor those individuals responsible for Plan Total RKA fees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

254.   Defendants Smith & Nephew and Board had a duty to ensure that the individuals responsible for Plan Total RKA fees possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's Total RKA fees; and reported regularly to Defendants.

255.   The unreasonable Total RKA fees paid by the Plan inferentially establish that Defendants Smith & Nephew and Board breached their duty to monitor by, among other things:

  (a)   Failing to monitor and evaluate the performance of individuals responsible for Plan Total RKA fees or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonable Total RKA expenses;

(b)    Failing to monitor the process by which the Plan's recordkeeper, Fidelity, was evaluated and failing to investigate the availability of more reasonably-priced recordkeepers; and

(c)    Failing to remove individuals responsible for Plan Total RKA fees whose performance was inadequate in that these individuals continued to pay the same Total RKA fees over numerous years even though solicitation of competitive bids would have shown that maintaining Fidelity as the recordkeeper at the contracted price was imprudent, excessively costly, all to the detriment of the Plaintiffs' and other Plan participants' retirement savings.

256.    As the consequences of the breaches of the duty to monitor for Total RKA fees the Plaintiffs and Plan participants suffered millions of dollars of objectively unreasonable monetary losses.

257.    Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants Smith & Nephew and Board are liable to restore to the Smith & Nephew Plan all losses caused by their failure to adequately monitor individuals responsible for Plan Total RKA fees. In addition, Plaintiffs and the Class are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

### THIRD CLAIM FOR RELIEF
**Breach of Duty of Prudence of ERISA, as Amended**
**(Plaintiffs, on Behalf of Themselves and Class, Against**
**Defendant Plan Committee – Unnecessary Managed Account Fees)**

258.    Plaintiffs restate the above allegations as if fully set forth herein.

259.    Defendant Plan Committee is a fiduciary of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

260.    29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Defendant Plan Committee in its administration of the Plan.

261.    Defendant Plan Committee, as a fiduciary of the Plan, is responsible for selecting RKA providers that charge objectively reasonable managed account fees.

262.    During the Class Period, Defendant Plan Committee had a fiduciary duty to do all of the following: ensure that the Plan's managed account fees were objectively reasonable; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

263.   During the Class Period, Defendant Plan Committee breached their fiduciary duty of prudence to Plan participants, including to Plaintiffs, by failing to: ensure that the Plan's managed account fees were objectively reasonable, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

264.   During the Class Period, Defendant Plan Committee further had a continuing duty to regularly monitor and evaluate the Plan's recordkeeper, Fidelity, and managed account provide, SA, to make sure they were providing the managed account services at reasonable costs, given the highly competitive market surrounding managed account services and the enormous bargaining power the Plan had to negotiate the best fees, and replace the imprudent managed account with prudent TDFs.

265.   During the Class Period, Defendant Plan Committee breached its duty to Plan participants, including to Plaintiffs, by failing to employ a prudent process and by failing to evaluate the cost of the Plan's managed account service critically or objectively in comparison to other asset allocations options available to the Plan, such as TDFs.

266.   Defendant Plan Committee's failure to discharge its duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

267.   As a result of Defendant Plan Committee's breach of fiduciary duty of prudence with respect to the Plan, the Plaintiffs and Plan participants suffered millions of dollars in objectively unreasonable and unnecessary monetary losses.

268.   Defendant Plan Committee is liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Smith & Nephew Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendant Plan Committee is subject to other equitable relief as set forth in the Prayer for Relief.

**FOURTH CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
**(Plaintiffs, on Behalf of Themselves and Class, Against**
**Defendants Smith & Nephew and Board – Unnecessary Managed Account Fees)**

269.    Plaintiffs restate the above allegations as if fully set forth herein.

270.    Defendants Smith & Nephew and Board had the authority to appoint and remove members or individuals responsible for managed accounts on the Plan Committee and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

271.    In light of this authority, Defendants Smith & Nephew and Board had a duty to monitor those individuals responsible for managed account fees on the Plan Committee to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

272.    Defendants Smith & Nephew and Board had a duty to ensure that the individuals responsible for managed account fees possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to managed account fees; and reported regularly to Defendants Smith & Nephew and Board.

273.    The objectively unnecessary managed account fees paid by the Plan by having SA's managed account program inferentially establish that Defendants Smith & Nephew and Board breached their duty to monitor by, among other things:

(a)    Failing to monitor and evaluate the performance of individuals responsible for managed account fees on the Plan Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unnecessary managed account fees;

(b)    Failing to monitor the process by which the Plan's recordkeeper, Fidelity, was evaluated and failing to investigate the availability of more reasonably-priced asset allocation alternatives, like TDFs; and

(c)    Failing to remove individuals responsible for managed account fees on the Plan Committee whose performance was inadequate in that these individuals continued to pay the same managed account fees over numerous years even

though the managed account fees were unnecessary, given the lack of value associated with the SA managed account programs.

274.   As a consequence of the breach of the duty to monitor the Plan's managed account fees, the Plaintiffs and Plan participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

275.   Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants Smith & Nephew and Board are liable to restore to the Smith & Nephew Plan all losses caused by their failure to adequately monitor individuals responsible for Plan managed account fees on the Plan Committee. In addition, Plaintiffs and the Class are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

### FIFTH CLAIM FOR RELIEF
**Breach Of Duty Of Loyalty**
**(Plaintiffs, On Behalf Of Themselves And Class,**
**Against Plan Committee –  Misallocation Of Plan Forfeitures)**

276.   Plaintiffs restate the above allegations as if fully set forth herein.

277.   Defendant Plan Committee is a fiduciary of the Smith & Nephew Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

278.   Pursuant to 29 U.S.C. § 1104(a)(1)(A), Defendant Plan Committee was required to discharge their duties to the Smith & Nephew Plan "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

279.   Defendant Plan Committee have continually breached this duty of loyalty with respect to their control and management of the Plan's assets throughout the Class Period by choosing to utilize forfeited funds in the Plan for the benefit of Smith & Nephew rather than solely in the interest of the Plan participants and beneficiaries.

280.   Instead of acting solely in the interest of Plan participants by utilizing forfeited funds in the Plan to further reduce the administrative expenses charged to their individual accounts, Defendant Plan Committee chose to use Plan assets for the purpose of reducing Smith & Nephew's future contributions to the Plan, thereby saving Smith & Nephew tens of millions of dollars at the expense of

the Plan which received decreased company contributions and did receive contributions to pay for other Plan costs.

281.   In making this decision, Defendant Plan Committee was motivated primarily or exclusively by their own self-interest rather than the interests of the Plan's participants and beneficiaries.

282.   As a direct and proximate result of Defendant Plan Committee's fiduciary breaches described herein, the Plan suffered injury and loss for which it is personally liable and is subject to appropriate equitable relief, pursuant to 29 U.S.C. § 1109, including, without limitation, the disgorgement of all ill-gotten profits to Defendants resulting from the breach of their duty of loyalty.

283.   Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach.  Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

**SIXTH CLAIM FOR RELIEF**
**Breach of Duty of Prudence**
**(Plaintiffs, On Behalf Of Themselves and Class, Against**
**Defendant Plan Committee –  Misallocation Of Plan Forfeitures)**

284.   Plaintiffs restate the above allegations as if fully set forth herein.

285.   Pursuant to 29 U.S.C. § 1104(a)(1)(B), Defendant Plan Committee was required to discharge its duties with respect to the Smith & Nephew Plan "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

286.   Defendant Plan Committee has continuously breached its duty of prudence under 29 U.S.C. § 1104(a)(1)(B) throughout the class period by noting use the forfeited funds in the Plan exclusively to provide administrative credits to participant accounts, and instead used such Plan assets to reduce Smith & Nephew's own future contributions to the Plan.

287.   In deciding how to allocate forfeitures, Defendant Plan Committee utilized an imprudent and flawed process. Despite the conflict of interest presented by this decision, Defendant Plan Committee failed to undertake any reasoned and impartial decision-making process to determine whether using the forfeited funds in the Plan to reduce the Company's own future contribution expenses was in the best interest of the Plan's participants or was prudent, and failed to consider whether participants would be better served by another use of these Plan assets after considering all relevant factors.

288.   By refusing to exclusively use forfeited funds in the Plan to provide administrative credits to Plan participant accounts, and instead deciding to use these Plan assets to reduce Smith & Nephew's own future contribution expenses, Defendant Plan Committee caused the Plan to receive fewer contributions that would otherwise have increased Plan assets.

289.   As a direct and proximate result of Defendant Plan Committee's fiduciary breaches described herein, the Plan suffered injury and loss for which Defendant Plan Committee is personally liable and is subject to appropriate equitable relief, pursuant to 29 U.S.C. § 1109, including, without limitation, the disgorgement of all ill-gotten profits to Defendants resulting from the breach of their duty of prudence.

290.   Each Defendant knowingly participated in the breach of the other Defendants, knowing that such acts were a breach, enabled other Defendants to commit a breach by failing to lawfully discharge its own fiduciary duties, knew of the breach by the other Defendants and failed to make any reasonable effort under the circumstances to remedy the breach. Thus, each Defendant is liable for the losses caused by the breach of its co-fiduciary under 29 U.S.C. § 1105(a).

**SEVENHTH CLAIM FOR RELIEF**
**Fiduciary Prohibited Transactions**
**(Plaintiffs, On Behalf Of Themselves and Class,**
**Against Plan Committee –  Self-Dealing With Plan Forfeitures)**

291.   Plaintiff restates the above allegations as if fully set forth herein.

292.   29 U.S.C. § 1106(b) provides that "[a] fiduciary with respect to a plan shall not," among other things, "deal with the assets of the plan in his own interest or for his own account."

293.   Defendant Plan Committee violated this prohibition in its management and control of forfeiture funds in the Plan.  By allocating these Plan assets toward offsetting Smith & Nephew's future contributions owing to the Plan, thereby saving Smith & Nephew tens of millions of dollars in contribution expenses, Defendant Plan Committee dealt with the assets of the Plan in their own interest and for their own account.

294.   As a result of this prohibited conduct, Defendant Plan Committee caused the Plan to suffer losses in the amount of the Plan assets that were substituted for employer future contributions and the lost investment returns on those assets.

295.   Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the prohibited conduct alleged in this claim, to restore to the Plan all assets and profits obtained through the use of Plan assets and is subject to other equitable or remedial relief as appropriate.

**<u>EIGHTH CLAIM FOR RELIEF</u>**
**Failure to Adequately Monitor Other Fiduciaries**
**(Plaintiffs, on behalf of Themselves and Class,**
**<u>Against Defendants Smith & Nephew and Board – Misallocation of Plan Forfeitures</u>)**

296.   Plaintiffs restate the above allegations as if fully set forth herein.

297.   Defendants Smith & Nephew and Board had the authority to appoint and remove members or individuals responsible for Plan forfeitures on the Plan Committee and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

298.   In light of this authority, Defendants Smith & Nephew and Board had a duty to monitor those individuals responsible for Plan forfeitures on the Plan Committee to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Smith & Nephew Plan in the event that these individuals were not fulfilling those duties.

299.   Defendants Smith & Nephew and Board had a duty to ensure that the individuals responsible for Plan forfeitures possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their

decisions and analysis with respect to the Smith & Nephew Plan's forfeitures; and reported regularly to Defendants Smith & Nephew and Board.

300.   The objectively disloyal, imprudent, and conflicted manner in which Defendant Plan Committee handled Plan forfeitures inferentially establish that Defendants Smith & Nephew and Board breached their duty to monitor by, among other things:

(a)   Failing to monitor and evaluate the performance of individuals responsible for Plan forfeitures on the Plan Committee or have a system in place for doing so, standing idly by as the Smith & Nephew Plan misallocated Plan forfeitures for Smith & Nephew's benefit;

(b)   Failing to monitor the process by which the Plan Committee was evaluated and failing to investigate the proper use of Plan forfeitures; and

(c)   Failing to remove individuals responsible for Plan forfeitures on the Plan Committee whose performance was inadequate in that these individuals continued to misallocate Plan forfeitures for the benefit of Smith & Nephew.

301.   As the consequences of the breaches of the duty to monitor for Plan forfeitures, the Plaintiffs and Plan participants suffered tens of millions of dollars of objectively unreasonable and unnecessary monetary losses.

302.   Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants Smith & Nephew and Board are liable to restore to the Smith & Nephew Plan all losses caused by their failure to adequately monitor individuals responsible for Plan forfeitures on the Plan Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

WHEREFORE, Plaintiffs pray that judgment be entered and requests the following relief:

A.   A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.   Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.   A Declaration the Defendants are fiduciaries, have breached their fiduciary duties of loyalty and prudence under ERISA, and engaged in fiduciary prohibited transactions, causing harm to Plan participants and beneficiaries;

D.   An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty and prohibited transactions, including restoring to the Plan all losses resulting from paying unreasonable Total RKA fees, managed account fees, and misallocating Plan forfeitures, and restoring to the Plan

A4956C

all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.    An Order requiring Smith & Nephew to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against Smith & Nephew as necessary to effectuate relief, and to prevent Smith & Nephew's unjust enrichment;

F.    An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary/consultant or fiduciaries to run the Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties;

H.    An award of pre-judgment interest;

I.    An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.    Such other and further relief as the Court deems equitable and just.

Respectfully submitted,

Date: August 30, 2024                    **JONATHAN M. FEIGENBAUM, ESQ.**

/s/ *Jonathan M. Feigenbaum*
Jonathan M. Feigenbaum
BBO #546686
184 High Street, Suite 503
Boston, MA 02110
Telephone: (617) 357-9700
jonathan@erisaattorneys.com

**WALCHESKE & LUZI, LLC**

Paul M. Secunda (*pro hac vice* pending)
235 N. Executive Dr., Suite 240
Brookfield, Wisconsin 53005
Telephone: (414) 828-2372
psecunda@walcheskeluzi.com

*Attorneys for Plaintiffs and Proposed Class*