| | |
|---|---|
| DANIEL NYKIEL and ANNEMARI COOLEY, individually, and as representatives of a Class of Participants and Beneficiaries of the Smith & Nephew U.S. Savings Plan, <br><br> Plaintiffs, <br><br> v. <br><br> SMITH & NEPHEW, INC., BOARD OF DIRECTORS OF SMITH & NEPHEW, INC., U.S. PENSION AND BENEFITS EXECUTIVE COMMITTEE OF SMITH & NEPHEW, INC., <br><br> Defendants. | Case No. 1:24-cv-12247-NMG <br><br><br> Class Action Amended Complaint For Claims Under 29 U.S.C. § 1132(a)(2) |

## CLASS ACTION AMENDED COMPLAINT

Plaintiffs, Daniel Nykiel and Annemari Cooley ("Plaintiffs"), individually and as representatives of a Class of Participants and Beneficiaries of the Smith & Nephew U.S. Savings Plan ("Plan" or "Smith & Nephew Plan"), by their counsel, WALCHESKE & LUZI, LLC, and JONATHAN M. FEIGENBAUM, ESQ., as and for a claim against Defendants, allege and assert to the best of their knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the following:

### INTRODUCTION

1.     401(k) defined contribution plans such as the Smith & Nephew Plan have become America's primary retirement savings vehicle. As with all defined contribution retirement plans that require participants to bear the costs of plan administration, the Plan participants' retirement savings suffer when the Plan mismanages plan assets, when employers use Plan assets for their own benefit, or pay excessive plan administration fees.

2. Defendants Smith & Nephew, Inc. ("Smith & Nephew"), the Board of Directors of Smith & Nephew, Inc. ("Board"), and the U.S. Pension and Benefits Executive Committee of Smith & Nephew, Inc. ("Plan Committee") (collectively, "Defendants"), utilized the Plan's forfeitures, a type of plan asset, to defray *unreasonable* Plan recordkeeping and administrative ("RKA") expenses and then utilized tens of millions of dollars worth of Plan forfeitures to benefit themselves by reducing their employer contributions to the Plan, violating ERISA's party-in-interest and fiduciary prohibited transaction rules.

3. Furthermore, Defendants failed to implement a prudent fiduciary process to control the Smith & Nephew Plan's overall managed account ("MA") expenses, and Plan participants in the MA program paid vastly more than what comparable very large retirement plans pay for comparable MA services.

4. Plaintiffs, current and former participants, in the Smith & Nephew Plan, bring this ERISA action in a representative capacity on behalf of the Plan under 29 U.S.C. §§ 1132(a)(2), and under Fed. R. Civ. P. 23 as representatives of a class of participants and beneficiaries of the Smith & Nephew Plan, against Defendants for transactions prohibited by ERISA and for breach of the fiduciary of prudence with regard to managed accounts. Plaintiffs' claims are brought on behalf of the Plan and seek to remedy losses suffered by the Plan under 1132(a)(2) and 409(a).

5. More specifically, Plaintiffs allege that Defendants: (a) improperly utilized forfeited Plan assets to defray unreasonable Plan RKA expenses and to reduce future employer contributions for their own selfish interests; (b) paid unreasonable compensation for the Plan's Personalized Planning & Advice ("PPA") MA service; and (c) failed to monitor the Plan Committee with regard to the excessive Plan MA services.

## JURISDICTION AND VENUE

6. This Court has federal question subject matter jurisdiction under 28 U.S.C. § 1331 because this is an action under 29 U.S.C. §§ 1132(a)(2) and (3) for which federal district courts have exclusive jurisdiction under 29 U.S.C. § 1132(e)(1).

7.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

8.     This district is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 29 U.S.C. § 1391(b)(2) since a substantial part of the events or omissions giving rise to the claim occurred here.

## PARTIES AND THE PLAN

9.     Smith & Nephew is a medical technology company focused on the repair, regeneration and replacement of soft and hard tissue. Smith & Nephew employs roughly 20,000 people worldwide, with about 7,500 employees in the United States. The Smith & Nephew Plan and the Plan Committee, according to its most recent Summary Plan Description ("SPD"), is located at 150 Minuteman Rd., Andover, MA 01810.

10.     The Smith & Nephew Plan is a defined contribution employee pension benefit plan under 29 U.S.C. § 1002(2)(A) and § 1002(34).

11.     Smith & Nephew is the Plan's sponsor under 29 U.S.C. § 1002(16)(B).

12.     The Plan Committee is the Plan's administrator within the meaning of 29 U.S.C. § 1002(16)(A), and are fiduciaries for the Plan. In addition, the members of the Committee (the Plan Committee Members) are also fiduciaries for the Plan. "[W]here, as here, a committee or entity is named as the plan fiduciary, the corporate officers or trustees who carry out the fiduciary functions are themselves fiduciaries and cannot be shielded from liability by the company." *Stewart v. Thorpe Holding Co. Profit Sharing Plan*, 207 F.3d 1143, 1156 (9th Cir. 2000).

13.     As required by 29 U.S. C. § 1102(a)(1), the Plan is established and maintained by a written plan document, the Smith & Nephew U.S. Savings Plan (As amended and Restated Effective January 1, 2021) ("Plan document").

14.     Defendants chose Fidelity Investments Institutional ("Fidelity") to provide the Plan's RKA services during the Class Period.

15.     Defendants chose Strategic Advisors, Inc. ("SA"), a wholly-owned subsidiary of Fidelity, to provide MA services to Plan participants through the PPA program during the Class Period.

16. Plaintiff Daniel Nykiel is a resident of Collierville, Tennessee. Plaintiff Nykiel worked for Smith & Nephew as a Gage Designer and in various management position in Orthopaedics in Memphis, TN from August 1, 2007, until August 12, 2022, and had an active account in the Plan until January 31, 2023, when he rolled out of the Plan.

17. Plaintiff Nykiel was invested in the following Plan investments: MFS Int'l Equity Fund R6, Jennison Small Cap Fund, Vanguard Market Index Fund, Hartford Mid Cap Fund Y, Vanguard Institutional Index Fund, Vanguard Morgan Growth Admiral Fund, Vanguard Target 2025 Fund, Vanguard Target 2050 Fund, Wellington Mid-Cap Fund, BP Large Cap Value Equity CIT, and MIP Class II Stable Value Fund.

18. Plaintiff Annemari Cooley is a resident of Salem, Oregon. She has been employed by Smith & Nephew from April 2019 until present as both a Sr. Director Clinical Development (4/19-6/22) and Sr. Director, Medical Education (6/22 to present).

19. Plaintiff Cooley has an active account in the Plan. She has also been enrolled in the SA PPA program during her time in the Plan.

20. Plaintiff Cooley has been invested in the following Plan investments: Vanguard Institutional Stock Market Fund, MFS Int's Equity 3A Fund, Vanguard Market Index Fund, BP Large Cap Value Equity CIT, Vanguard Institutional 500 Index Fund, Vanguard US Growth Admiral Fund, Vanguard Total Bond Market Index Fund, LS Core Plus Fixed Income C Fund, and MIP Class II Stable Value Fund.

21. Plaintiffs both have Article III standing to bring this action on behalf of the Smith & Nephew 401(k) Plan because they suffered actual injuries to their Plan accounts by not having forfeited Plan assets reallocated to their Plan accounts as a result of Defendants paying unreasonable Plan administrative expenses and reducing employer contributions for their own benefit. Those injuries are fairly traceable to Defendants using Plan forfeitures to defray unreasonable Plan administration expenses and for their own benefit to reduce their future contributions to the Smith & Nephew Plan. Finally, these injuries diminished the savings in Plaintiffs' retirement accounts in the Plan and reduced, dollar for dollar (and more when compounded) Plaintiffs' retirement savings.

22.     Having established Article III standing, Plaintiffs may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for relief that sweeps beyond their own injuries.

23.     The Plaintiffs and all participants in the Plan did not have knowledge of all material facts (including, among other things, the excessive RKA and MA fees, as well as the misuse and misallocation of Plan forfeitures) necessary to understand that Defendants breached their fiduciary duties and engaged in prohibited transactions until shortly before this suit was filed.

24.     Having never managed a very large 401(k) Plan, Plaintiffs, and all participants in the Plan, lacked actual knowledge of the excessive RKA and MA fees, and of the misuse and misallocation of Plan forfeitures.

25.     With 9,490 active participants and $1.35 billion in assets under management as of December 31, 2023, the Smith & Nephew Plan is one of the largest retirement plans in the country. It ranks in the top 0.16% of over 500,000 401(k) plans in terms of the number of participants and the top 0.10% of plans in terms of the value of its assets.

## ERISA FIDICIARY STANDARDS

26.     ERISA exists, in large part, to protect the interests of participants, and their beneficiaries, in employee retirement plans. *See Aetna Health Inc. v. Davila*, 542 U.S. 200, 208, 124 S. Ct. 2488, 2495, 159 L. Ed. 2d 312 (2004) (citing 29 U.S.C. § 1001(b)).

27.     "[A]ny person who exercises discretionary authority or control in the management or administration of an ERISA plan" is, under the statute's terms, a fiduciary. *See Barchock v. CVS Health Corp.,* 886 F.3d 43, 44 (1st Cir. 2018) (citing 29 U.S.C. § 1002(21)(A)).

28.     ERISA imposes strict duties of loyalty and prudence upon fiduciaries of retirement plans, like the Smith & Nephew Plan, that are covered by ERISA.

29.     ERISA provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; [and] (B) with the care, skill, prudence and diligence under the circumstances then prevailing

that a prudent man acting in like capacity and familiar with such matters would use in the conduct of like character and with like aims." ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

30.     ERISA's fiduciary duties under have been described as being among the "highest known to the law." *See Sellers v. Trustees of Bos. Coll.*, 2024 WL 1586755, at *5 (D. Mass. Apr. 11, 2024).

31.     The obligation to ensure that retirement plan fees are reasonable is at the heart of ERISA fiduciary duties. *Marshall v. Snyder*, 572 F.2d 894, 897 (2d Cir. 1978) ("The responsibility for paying reasonable compensation was the unequivocal fiduciary responsibility of the [plan's fiduciaries].").

32.     As courts in the First Circuit have explained, ERISA fiduciaries "have a general duty to monitor recordkeeping expenses and, more generally, ... a prudential duty to be cost-conscious in the administration of a plan[,]" and they "breach their duty of prudence by failing diligently to investigate and monitor recordkeeping expenses as well as other administrative expenses." *Daggett v. Waters Corp.*, 2024 WL 1677421, at *9 (D. Mass. Apr. 18, 2024); *Turner v. Schneider Elec. Holdings, Inc.*, 530 F. Supp. 3d 127, 136 (D. Mass. 2021); *Moitoso v. FMR LLC*, 451 F. Supp. 3d 189, 213 (D. Mass. 2020).

33.     The content of ERISA fiduciary's duties is "derived from the common law of trusts." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2465 (2014). Therefore, "[i]n determining the contours of an ERISA fiduciary's duty, courts often must look to the law of trusts." *Tibble v. Edison Int'l,* 575 U.S. 523, 528-529 (2015). Under the common law of trusts, fiduciaries may "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." Restatement (Third) of Trusts § 90(c)(3) (2007).

34.     In determining whether ERISA fiduciary defendants fulfilled their duties under the statute, courts consider how a prudent and loyal financial expert familiar with investment industry practices and fees would have acted.  As explained below, here, a prudent and loyal financial expert would have acted very differently than did Defendants.

35.     Defendants failed to fulfill their duty to prudently control the RKA and managed account expenses paid by the Plan, and in so doing, caused Plan forfeitures to be used to pay unreasonable plan administrative expenses.

36.     Fidelity, and SA are parties-in-interest under 29 U.S.C. § 1002(14)(B), because they "provid[e] services to [a] plan," whereas Smith & Nephew is a party-in-interest because it is an employer "any of whose employees are covered by such plan." *Id.*, § 1002(14)(C),

37.     In deciding to use Plan forfeitures to pay unreasonable compensation, Defendants violated ERISA's ban on certain transactions under 29 U.S.C. § 1106(a)(1)(C) and (D), by using Plan forfeitures to unreasonably compensate Fidelity and SA for RKA and MA services, and by permitting Smith & Nephew to use plan assets for the benefit of Smith & Nephew.

38.     The exemption in 29 U.S.C. § 1108(b)(2)(A) does not apply to Defendants' conduct because as illustrated below the compensation received by Fidelity and SA does not amount to "reasonable compensation," as the RKA compensation was excessive based on services rendered.

39.     Because Defendants are fiduciaries to the Plan and "deal[t] with the assets of the plan in [their] own interest or for [their] own account," they also violated the fiduciary prohibited transaction tule under 29 U.S.C. § 1108(b)(1), by benefiting themselves as far as reducing their own future contributions to the Smith & Nephew Plan.

## FACTUAL ALLEGATIONS

### A.     ERISA'S FIDUCIARY STANDARDS IN 401(k) INDUSTRY

40.     The Plan is an individual account, defined contribution pension plan covered by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*.

41.     The Plan is funded by a combination of salary withholding by Plan participants and employer matching contributions.

42.     Participant accounts in the Plan are comprised of employee contributions, any employer contributions and any investment income from the investment options selected within the participant account, less fees and expenses.

43.     In a defined contribution retirement plan such as the Smith & Nephew Plan, the plan "provides for an individual account for each participant and for benefits solely upon the amount contributed to the participant's account, and any income, expenses, gains and losses … which may be allocated to such participant's accounts." ERISA § 3(34), 29 U.S.C. § 1002(34).

44.     Unlike traditional defined benefit pension plans, which obligate employers to pay a particular amount at retirement (benefits that are guaranteed by the Pension Benefit Guarantee Corporation), participants in defined contribution plans (like the Smith & Nephew Plan) get no more at retirement than they have in their accounts at that time.

45.     As such, ERISA's fiduciary duty to ensure fees paid by the Plan are reasonable is especially important in the context of fees paid by defined contribution plan participants, as the fees reduce dollar for dollar (and more, when compounded) the amount of benefits participants will receive at retirement.

46.     As the Supreme Court explained in 2015, in defined contribution plans like the Plan, employees' benefits at retirement "are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, ***less expenses***." *Tibble*, 575 U.S. at 525 (emphasis added).

47.     Seemingly small differences in fees can lead to vastly different outcomes at retirement. For example, a 1% difference in fees can mean 28% less in retirement assets over a thirty-five-year period, U.S. Dept. of Labor, A Look at 401(k) Plan Fees, (August 2013) at 1-2, *https://www.dol.gov/ebsa/publications/401k_employee.html.* Therefore, fees are of critical importance to an ERISA fiduciary's prudent investment menu selection.

48.     As such, plan fiduciaries like Defendants must: (1) establish a prudent process for selecting service providers and reviewing investments; (2) ensure that fees paid to service providers are reasonable in light of the level and quality of services provided; and (3) monitor service providers once selected to make sure they continue to be prudent choices.

## B.    SMITH & NEPHEW PLAN RKA FEES

49.     Defined contribution plan fiduciaries of very large 401(k) plans hire service providers to deliver retirement plan benefits to their employees. There is a group of national retirement plan services providers commonly and generically referred to as "recordkeepers," that have developed bundled service offerings that can meet all the needs of very large retirement plans with a prudent and materially identical level and caliber of services. Fidelity is the largest of such recordkeepers.

50.     There are numerous recordkeepers in the marketplace who are equally capable of providing a high level of service to very large defined contribution plans like the Smith & Nephew Plan.

51.     The cost of RKA services depends mostly on the number of participants, and less so on the amount of Plan assets under management.

52.     Because the cost of recordkeeping services depends primarily on the number of participants, the cost of providing recordkeeping services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account.

53.     According to the Smith & Nephew Plan July 8, 2024 Required Disclosure Information pursuant to ERISA Section 404(a)5), "[p]lan administrative fees [or Total RKA] may include recordkeeping, legal, accounting, trustee, and other administrative fees and expenses associated with maintaining the Plan."

54.     There are at least three types of RKA services provided by all recordkeepers and other service providers.

55.     The first type, "Bundled RKA," may include, but are not limited to:

a.      Recordkeeping;

b.      Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

c.      Administrative Services related to converting a plan from one recordkeeper to another recordkeeper;

d.      Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., Summary Plan descriptions and other participant materials);

e.      Maintenance of an employer stock fund;

f.      Plan Document Services which include updates to standard plan documents to ensure compliance with regulatory and legal requirements;

g.   Plan consulting services including assistance in selecting the investments offered to participants;

h.   Accounting and audit services including the preparation of annual reports, e.g., Form 5500;

i.   Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan follows legal requirements and the provisions of the plan;

j.   Compliance testing to ensure the plan complies with Internal Revenue nondiscrimination rules; and

k.   Trustee/custodian services.

56.   The services Fidelity is providing for the Plan and its participants consist in these standard recordkeeping services, and Fidelity is not providing anything exceptional, unusual, or customized, with regard to the Bundled RKA services provided to the Plan and its participants.

57.   Bundled RKA services are necessary for every defined contribution plan. These services for a qualified retirement plan, like the Smith & Nephew Plan, are essentially fixed and largely automated. It is a system where costs are driven purely by the number of inputs and the number of transactions. In essence, it is a computer-based bookkeeping system.

58.   In other words, the Plan provided participants all the commoditized Bundled RKA services provided to all other very large 401(k) plan participants. The quality or type of Bundled RKA services provided by competitor recordkeepers are comparable to that provided by Fidelity. Any differences in RKA services are immaterial to the price quoted by recordkeepers other service providers for such services.

59.   Bundled RKA services are largely standardized because the RKA providers must provide these services at scale to a large number of plans and must comply with regulatory requirements. They cannot offer customized sets of services to each individual plan.

60.   The bulk of the fee paid for Bundled RKA services pays for core services that do not vary from plan to plan.

61.     Industry experts have maintained for years that for very large retirement plans like the Plan, prudent fiduciaries treat Bundled RKA services as a commodity with little variation in price. "Custody and recordkeeping are 'commodity' services. Like any commodity, given equal quality, the key benchmark for these services is price. The cheaper you can find competent custody and recordkeeping services, the better for participants." Eric Droblyen, *Evaluating 401(k) Providers: Separating Commodity from Value-Added Services*, https://www.employeefiduciary.com/blog/evaluating-401k-providers-separating-commodity-value-added-services (Feb. 10, 2015).

62.     The Plan provided participants all the commoditized and fungible RKA services provided to all other very large 401(k) plan participants. The quality or type of RKA services provided by competitor recordkeepers are comparable to that provided by Fidelity.

63.     Since well before 2018, industry experts have maintained that for massive retirement plans like the Smith & Nephew Plan, prudent fiduciaries treat RKA services as a commodity with little variation in price.

64.     "Custody and recordkeeping are 'commodity' services. Like any commodity, given equal quality, the key benchmark for these services is price. The cheaper you can find competent custody and recordkeeping services, the better for participants." Eric Droblyen, *Evaluating 401(k) Providers: Separating Commodity from Value-Added Services*, https://www.employeefiduciary.com/blog/evaluating-401k-providers-separating-commodity-value-added-services (Feb. 10, 2015).

65.     Fidelity, the largest 401k recordkeeper in the country, has in fact conceded that the RKA services that it provides to other massive plans are fungible and commodified, including the plan services provided to its own employees.

66.     As part of stipulated facts in a previous case, Fidelity stated: "The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year, and the value of the recordkeeping services that Fidelity has provided to the Plan since January

1, 2017 is $14 per participant, per year. Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity it could have obtained recordkeeping services for these amounts during these periods. *The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period (November 18, 2014 to the present).*" See *Moitoso v. FMR LLC, et al.*, 1:18-CV-12122-WGY, Stipulation of Facts, Dkt. 128-67, at 4-5 (D. Mass. Sep. 6, 2019) (emphasis added).

67.     Because Bundled RKA services are commoditized, recordkeepers primarily differentiate themselves based on price, and will aggressively bid to offer the best price in an effort to win the business, particularly for very large plans like the Smith & Nephew Plan.

68.     Bundled RKA services are essentially fungible and the market for them is highly competitive. This highly competitive Bundled RKA market is filled with equally capable recordkeepers, who can provide comparable Bundled RKA services for less if only asked to provide bids to very large plans like the Smith & Nephew Plan.

69.     Given the very large size of the Smith & Nephew Plan, the price paid by the Plan for Bundled RKA services to Fidelity, and the trend of price compression for Bundled RKA services over the last six years, it is possible to infer that Defendants did not engage in any competitive solicitation of Bundled RKA service bids during the Class Period givem the amount paid for Bundled RKA services.

70.     The second type of essential RKA services, hereafter referred to as "A La Carte services," provided by all recordkeepers, often have separate, additional fees based on the conduct of individual participants and the usage of the service by individual participants. These "A La Carte RKA" services typically include the following:

  a. Loan set-up fees and loan maintenance fees;

  b. Brokerage services/account maintenance;

  c. Distribution and withdrawal services; and

  d. Processing of Qualified Domestic Relations Orders (QDROs).

71.     The third type of RKA fees are Ad Hoc fees which are transaction fees and other administrative fees, and include such things as ESOP fees, fees for service, and terminated maintenance fees.

72.     The sum of the Bundled RKA fees, A La Carte RKA fees, and Ad Hoc RKA fees equals the "Total RKA fees."

73.     This action focuses on *Plan Total RKA fees paid to Fidelity* and related to participant loan processing, recordkeeping fees, and account maintenance fees, as outlined in Schedule C of the 2021 Department of Labor ("DOL") 5500 Form filed by the Smith & Nephew Plan fiduciaries.

74.     A review of the Smith & Nephew Plan's Department of Labor 2021 5500 Form, Schedule C, illustrates the direct compensation that the Plan paid to Fidelity, as opposed to other Plan service providers for various Plan services.

75.     For purposes of calculating *RKA fees paid to Fidelity*, as opposed to amounts paid to other Plan service providers, Plaintiffs utilized direct compensation paid to Fidelity of $604,380 in 2021 as outlined in the 2021 Schedule C.

76.     The associated service codes indicate payment to Fidelity for participant loan processing (code 37), recordkeeping fees (code 64), and account maintenance fees (code 65).

77.     Importantly, the Smith & Nephew Plan pays separate amounts to other Plan service providers when Fidelity has been the Plan recordkeeper, including to: (1) Mercer for consulting; (2) Strategic Advisors for investment advisory/managed accounts; (3) Alston & Bird LLP for consulting and legal services; (4) Horne for consulting and auditing services; and (5) Dixon Hughes Goodman, LLP for consulting services.

78.     Although comparator plans, like the Terracon 401(k) and ESOP Plan, Cook Children's Health Care System Retirement Plan, Expeditors International of Washington, Inc. 401(K) Plan, and the Operating Engineers Local 66 Annuity and Savings Fund, all use different service codes on their 5500 Forms than the Smith & Nephew Plan, as the Third Circuit recently and aptly observed in *Mator v. Wesco Distrib, Inc.*, "the different service codes do not undermine the [plan] comparisons because they apparently overlap." All of the plans list either 'Recordkeeping fees,' 'Recordkeeping and

information management (computing, tabulating, data processing),' or both." *See id.*, 102 F.4th 172, 186 (3d Cir. 2024).

79.    The following charts shows the same is true with regard to the Smith & Nephew's comparator plans with regard to both asset size and participant size. Each list recordkeeping fees (Code 64), "Recordkeeping and information management (computing, tabulating, data processing) (Code 15), or both, just as in *Mator:*

| Plan | Service / Compensation Codes |
|---|---|
| The Terracon 401(K) and ESOP Plan | 15, 26, 50, 64 |
| Cook Children's Health Care System Retirement Plan | 60, 64, 65, 71 |
| Operating Engineers Local 66 Annuity and Savings Fund | 15, 64 |
| Expeditors International of Washington, Inc. 401(K) Plan | 15, 21, 25, 28, 37, 38, 49, 50, 52, 59, 62, 64, 65 |

80.    Consequently, the RKA analysis focused on recordkeeping (Codes 15 and 64) provided by Fidelity and other plan recordkeepers is an appropriate method to make an apples-to-apples comparison, and then infer a flawed fiduciary process from the disparity in RKA fees.

81.    In short, "[a]t this stage, the record does not reveal the codes' precise meanings, nor whether all plans define the codes consistently. But given that all the plans received some portion of an overlapping constellation of recordkeeping services, the comparisons help nudge the [plaintiffs'] claims across the line from possible to plausible." *Mator*, 102 F.4th at 186.

82.    The investment options selected by plan fiduciaries also often have a portion of the total expense ratio allocated to the provision of recordkeeping performed by the recordkeepers on behalf of the investment manager.

83.    Recordkeepers often collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund. These fees are known as "revenue sharing" or "indirect compensation."

84.     The Smith & Nephew Plan paid both direct and indirect RKA fees during the Class Period to Fidelity.

85.     The comparator plans either paid direct and indirect RKA fees or only direct RKA fees, but indirect compensation was taken into consideration for both the Smith & Nephew Plan and the comparator plans.

## C.     STANDARD OF CARE FOR PRUDENT FIDUCIARIES SELECTING & MONITORING RKA SERVICE PROVIDERS

86.     Prudent plan fiduciaries ensure they are paying only reasonable fees for Total RKA by engaging in an "independent evaluation," see *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 742 (2022), and soliciting competitive bids from other recordkeepers to perform the same level and quality of services currently being provided to the Plan.

87.     Prudent plan fiduciaries can easily receive a quote from other RKA providers to determine if the current level of Total RKA fees is reasonable in light of the level and quality of Total RKA fees. It is not a cumbersome or expensive process.

88.     It is the standard of care prevailing among industry experts to solicit competitive bids every three to five years. *See* CAPTRUST, *Understanding and Evaluating Retirement Plan Fees | Part One: A Holistic Approach*, https://www.captrust.com/understanding-and-evaluating-retirement-plan-fees-part-one-a-holistic-approach/

89.     "[B]est practice is . . . a more formal recordkeeper search and selection process conducted approximately every three to five years. Recordkeeping and administrative fees should be evaluated and compared to plans of similar size and type that are receiving analogous services. While each plan is unique—making an apples-to-apples comparison imperfect—evaluating fees against similarly situated and sized plans provides a good reference point in helping to determine if plan fees are reasonable." *Id*.

90.     Having received bids, prudent plan fiduciaries can negotiate with their current RKA providers for a lower fee or move to a new RKA provider to provide a materially similar level and qualities of services for a more competitive reasonable fee if necessary.

91.     Prudent fiduciaries implement three related processes to prudently manage and control a plan's RKA costs. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

92.     First, a hypothetical prudent fiduciary tracks RKA provider's expenses by demanding documents that summarize and contextualize their compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

93.     Second, to make an informed evaluation as to whether a RKA provider is receiving no more than a reasonable fee for the quality and level of services provided to a plan, prudent hypothetical fiduciaries must identify all fees, including direct compensation and revenue sharing being paid to the plan's RKA provider.

94.     Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the RKA rates that are available. By soliciting bids from other RKA providers, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for the same level and quality of RKA services.

95.     Accordingly, the best way to determine the *reasonable*, as opposed to the *cheapest* or *average*, market price for a given quality and level of RKA services is to obtain competitive bids from other providers in the market. *Hughes v. Northwestern Univ.*, 63 F.4th 615, 625-626 (7th Cir. 2023) ("*Hughes II*") (although "a fiduciary *need not constantly solicit quotes* for recordkeeping services to comply with its duty of prudence, . . . fiduciaries who fail to monitor the reasonableness of plan fees and *fail to take action to mitigate excessive fees—such as by* adjusting fee arrangements, *soliciting bids*, consolidating recordkeepers, negotiating for rebates with existing recordkeepers, or other means—may violate their duty of prudence.") (emphasis added).

96.     Prudent fiduciaries in like circumstances to the Smith & Nephew Plan would have solicited competitive bids. *See Turner*, 530 F. Supp. 3d at 136-37.

## D.     SMITH & NEPHEW PLAN PAID UNREASONABLE RKA COMPENSATION

97.     Every defined contribution plan requires recordkeeping.  There are numerous vendors that can provide high quality recordkeeping services to defined contribution plans such as the Smith &

Nephew Plan. These vendors strenuously compete against each other by offering the lowest price for the best service.

98.     Defendants, as the Plan's fiduciaries, selected the RKA service providers for the Smith & Nephew Plan and controlled which investment options and investment vehicles were available in the Plan. Defendants were responsible for monitoring those service providers, and the fees they charged, on an ongoing basis.

99.     Large plans are generally able to leverage their size to obtain lower fees per participant, in part because of the economies of scale that large plans provide recordkeepers.

100.    With approximately 10,000 participants and over a billion dollars in assets during the Class Period, the Smith & Nephew Plan is one of the largest defined contribution plans in the United States.

101.    The Plan thus had the bargaining power to obtain and maintain very low fees for RKA services and had significant leverage to procure high-level RKA services at a low cost.

102.    Defendants failed to leverage the Smith & Nephew Plan's size to obtain reasonable Total RKA fees.

103.    And, for those lower prices, other very large plans receive equivalent or better RKA services than did the Smith & Nephew Plan.

104.    During the Class Period, Defendants egregiously failed to regularly monitor the Plan's Total RKA compensation paid to Fidelity.

105.    During the Class Period, Defendants failed to regularly solicit quotes and/or competitive bids from RKA providers, including but not limited to Fidelity, in order to avoid paying unreasonable Total RKA fees.

106.    During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants followed a fiduciary process that was ineffective given the objectively unreasonable Total RKA compensation it paid to Fidelity for at least six years, and in light of the level and quality of Total RKA services it received that were materially-similar, fungible services available through other RKA providers and provided to other very large plans at a much lower cost.

107.    As set forth in the table below, from the years 2018 through 2022, based upon information available from Schedule C of the Plan 5500 Forms from 2018 to 2022, the Smith & Nephew Plan paid to Fidelity an effective average annual Total RKA fee of $62 per participant:

## Total Recordkeeping and Administration (Total RKA) Fees

|  | 2018 | 2019 | 2020 | 2021 | 2022 | Average |
|---|---|---|---|---|---|---|
| Participants | 8,024 | 8,879 | 8,993 | 9,560 | 9,968 | 9,085 |
| Est. Total RKA Fees | $528,096 | $487,268 | $516,301 | $604,380 | $673,782 | $561,965 |
| Est. Total RKA Per Participant | $66 | $55 | $57 | $63 | $68 | $62 |

108.    The table below illustrates the Total RKA fees paid in 2021 by other comparable plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, compared to the 2021 Total RKA fees paid by the Smith & Nephew Plan:

**Comparable Plans' Total RKA Fees Based on Publicly Available Information - Form 5500**
(Price calculations are based on 2021 Form 5500 information)

| Plan | Participants | Total RKA Fee | Total RKA Fee /pp | Recordkeeper |
|---|---|---|---|---|
| The Terracon 401(K) and ESOP Plan | 7,769 | $266,251 | $34 | Schwab |
| Cook Children's Health Care System Retirement Plan | 8,392 | $250,824 | $30 | Fidelity |
| Expeditors International of Washington, Inc. 401(K) Plan | 8,937 | $343,520 | $38 | T. Rowe Price |
| **Smith & Nephew U.S. Savings Plan 2021 Fee** | **9,560** | **$604,380** | **$63** | **Fidelity** |
| Operating Engineers Local 66 Annuity and Savings Fund | 10,486 | $305,305 | $29 | Newport |

109.    The Smith & Nephew Plan paid over $600,000 a year in Total RKA fees in 2021 when, based on a $32 flat fee per participant, a more reasonable amount would have been just over $300,000.

110.     The ***Smith & Nephew Plan paid twice as much than necessary*** for Total RKA as compared to similarly-sized comparative plans receiving similar fungible and commoditized Plan services as the following chart illustrates:

### Total Recordkeeping and Administration (Total RKA) Fees

|  | 2018 | 2019 | 2020 | 2021 | 2022 | *Average* |
|---|---|---|---|---|---|---|
| **Participants** | 8,024 | 8,879 | 8,993 | 9,560 | 9,968 | *9,085* |
| **Est. Total RKA Fees** | $528,096 | $487,268 | $516,301 | $604,380 | $673,782 | *$561,965* |
| **Est. Total RKA Per Participant** | $66 | $55 | $57 | $63 | $68 | *$62* |
| **Reliable Est. of Reasonable Total RKA Fees** | $256,768 | $284,128 | $287,776 | $305,920 | $318,976 | *$290,714* |
| **Reliable Est. of Reasonable Total RKA Fees Per PP** | $32 | $32 | $32 | $32 | $32 | *$32* |
| **Est. Total RKA Losses** | $271,328 | $203,140 | $228,525 | $298,460 | $354,806 | *$271,252* |
| **Est. Total RKA Losses Per PP** | $34 | $23 | $25 | $31 | $36 | *$30* |

111.     From the years 2018 through 2022, the graph below illustrates the Total RKA fees paid by other comparable plans of similar sizes with similar amounts of money under management to their recordkeepers, receiving a similar level and quality of services, compared to the 2021 Total RKA fees paid by the Smith & Nephew Plan, with the white data points representing RKA fees that recordkeepers offered to (and were accepted by) comparable Plans:



112.     The trend line in the graph above represents an effective per participant Total RKA fee rate for a given number of participants around which a plan fiduciary would expect to obtain had the Plan fiduciary followed the standard of care to ensure the Plan paid only reasonable fees for materially similar RKA services.

113.     Prior to the Class Period, the fees recordkeepers were willing to accept for RKA services had materially stabilized such that fees the recordkeepers accepted in 2021 for RKA services were consistent with the fees recordkeepers would accept for all of 2018 to 2022. *See The Economics of Providing 401(k) Plans: Services, Fees, and Expenses, 2020*, ICI Research Perspective, at 4 (June 2021).

114.     The Total RKA fees paid by similarly-sized comparable plans provide evidence that the Total RKA fees paid by the Smith & Nephew Plan for materially similar commoditized RKA services were excessive and unreasonable, and leads to a reasonable inference that Smith & Nephew Plan fiduciaries employed an imprudent fiduciary process.

115.     The Total RKA fees paid by each of the comparable plans provides evidence that the Smith & Nephew Plan paid excessive fees because there are no RKA services offered by any recordkeeper that would warrant or reasonably explain the disparity between the Total RKA fees paid by the Smith & Nephew Plan and the Total RKA fees that other comparable plans paid for materially similar RKA services.

116.     The Plan's Total RKA fee rate range of $55/pp to $68/pp from 2018 to 2022 can be compared to the much lower Total RKA fee rates of other comparable plans.

117.     Each of the comparator plans identified below are among the closest 6/100[th] of 1% (0.06%) of all the defined contribution plans covered by ERISA.

118.     More specifically, there were around 690,128 plans in 2021 and only 404 plans had between 7,769 and 10,468 participants with a balance greater than zero at year-end. 689,724 plans or 99.94% of all plans have either less than 7,769 or more than 10,468 participants.

119.     Plans containing between 7,769 and 10,468 participants are among the most meaningful and appropriate to use as similarly-situated, comparable plans, and include the following:

120.     **Terracon 401(k) and ESOP Plan** ("Terracon"): The comparable fee rate of $34 per is comprise of $34/pp of direct compensation paid to Schwab Retirement Plan Services for providing RKA services disclosed on the 2021 Form 5500 Schedule C. Schwab did not receive any indirect compensation as disclosed in Part 1, Line 2(e) of Schedule C.

121.     The Terracon Plan is a meaningful benchmark because at the end of 2021, the Terracon Plan had around 7,769 participants, less than the 9,560 participants in the Plan in 2021. The costs to a recordkeeper for providing Total RKA services to a plan with more than 3,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the Terracon Plan and the Smith & Nephew Plan and any service differentials cannot explain the disparity between the fees paid by the Terracon Plan and the fees paid by the Smith & Nephew Plan.

122.     For example, the disparity of $29 per participant between the $34 per participant Total RKA rate for the Terracon Plan's fee compared to the Total RKA rate of $63 per participant paid by the Smith & Nephew Plan in 2021 represents over $270,000 annually and would conservatively represent more than 5,400 hours of RKA services in one year provided by employees of the recordkeeper. There are no special or different Total RKA services provided to any plan with between around 7,500 and 10,500 participants that would reasonably warrant incremental additional fees of over $270,000 for plans with similar numbers of participants.

123.     All else being equal, if the Terracon Plan can obtain a fee of $34 per participant with 7,769 participants, then the Smith & Nephew Plan, which ranged in participants from around 8,024 to around 9,968 throughout the Class Period, should be able to obtain a fee of around $32 per participant, *or lower*, as indicated by the trend line generated from the Total RKA Fee rates paid by all the comparable plans.

124.     The Terracon Plan is one of the closest 0.06% (six hundredth of 1%) of all defined contribution plans governed by ERISA. The massive disparity between the Total RKA fees paid by the Terracon Plan and the Smith & Nephew Plan's estimated effective Total RKA fee rate of around $63 per participant, viewed holistically and in conjunction with the evidence of the fees paid by all the other

comparable plans, leads to a plausible inference that the Plan paid excessive and unreasonable Total RKA fees and the Plan's fiduciary process was imprudent.

125.     **Cook Children's Health Care System Retirement Plan** ("Cook"): The comparable fee rate of $30 per participant is comprised of $26.41/pp of direct compensation paid to Fidelity from the 2021 Form 5500 Schedule C and a calculation of $3.48 of indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i by the revenue sharing rates disclosed on Line 3 of Part I of Schedule C.

126.     The Cook Plan is a meaningful benchmark because at the end of 2021, the Cook Plan had around 8,392 participants, less than the 9,560 participants in the Plan in 2021. The costs to a recordkeeper for providing Total RKA services to a plan with more than 3,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the Cook Plan and the Smith & Nephew Plan and any service differentials cannot explain the disparity between the fees paid by the Cook Plan and the fees paid by the Smith & Nephew Plan.

127.     For example, the disparity of $33 per participant between the $30 per participant Total RKA rate for the Cook Plan's fee compared to the Total RKA rate of $63 per participant paid by the Smith & Nephew Plan in 2021 represents over $310,000 annually and would conservatively represent more than 6,200 hours of RKA services in one year provided by employees of the recordkeeper. There are no special or different Total RKA services provided to any plan with between around 7,500 and 10,500 participants that would reasonably warrant incremental additional fees of over $310,000 for plans with similar numbers of participants.

128.     All else being equal, if the Cook Plan can obtain a fee of $30 per participant with 8,392 participants, then the Smith & Nephew Plan, which ranged in participants from around 8,024 to around 9,968 throughout the Class Period, should be able to obtain a fee of around $32 per participant, *or lower*, as indicated by the trend line generated from the Total RKA Fee rates paid by all the comparable plans.

129. The Cook Plan is one of the closest 0.06% (six hundredth of 1%) of all defined contribution plans governed by ERISA. The massive disparity between the Total RKA fees paid by the Cook Plan and the Smith & Nephew Plan's estimated effective Total RKA fee rate of around $63 per participant, viewed holistically and in conjunction with the evidence of the fees paid by all the other comparable plans, leads to a plausible inference that the Plan paid excessive and unreasonable Total RKA fees and the Plan's fiduciary process was imprudent.

130. **Expeditors International of Washington, Inc. 401(k) Plan** ("Expeditors"): The comparable fee rate of $38 per participant is comprised of $38/pp of direct compensation paid to T. Rowe Price from Form 5500 Schedule C and a calculation of $0/pp of indirect compensation derived from multiplying the value of the assets of each investment disclosed on the attachment referenced on Schedule H, Part IV, Line 4i times revenue sharing rates disclosed on Line 3 of Part I of Schedule C.

131. The Expeditors Plan is a meaningful benchmark because at the end of 2021, the Expeditors Plan had around 8,937 participants, less than the 9,560 participants in the Plan in 2021. The costs to a recordkeeper for providing Total RKA services to a plan with more than 3,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the Expeditors Plan and the Smith & Nephew Plan and any service differentials cannot explain the disparity between the fees paid by the Expeditors Plan and the fees paid by the Smith & Nephew Plan.

132. For example, the disparity of $25 per participant between the $38 per participant Total RKA rate for the Expeditors' fee compared to the Total RKA rate of $63 per participant paid by the Smith & Nephew Plan in 2021 represents over $230,000 annually and would conservatively represent more than 4,600 hours of RKA services in one year provided by employees of the recordkeeper. There are no special or different Total RKA services provided to any plan with between around 7,500 and 10,500 participants that would reasonably warrant incremental additional fees of over $230,000 for plans with similar numbers of participants.

133. All else being equal, if the Expeditors Plan can obtain a fee of $38 per participant with 8,937 participants, then the Smith & Nephew Plan, which ranged in participants from around 8,024 to

around 9,968 throughout the Class Period, should be able to obtain a fee of around $32 per participant, *or lower*, as indicated by the trend line generated from the Total RKA Fee rates paid by all the comparable plans.

134.     The Expeditors Plan is one of the closest 0.06% (six hundredth of 1%) of all defined contribution plans governed by ERISA. The massive disparity between the Total RKA fees paid by the Expeditors and the Smith & Nephew Plan's estimated effective Total RKA fee rate of around $63 per participant, viewed holistically and in conjunction with the evidence of the fees paid by all the other comparable plans, leads to a plausible inference that the Plan paid excessive and unreasonable Total RKA fees and the Plan's fiduciary process was imprudent.

135.     **Operating Engineers Local 66 Annuity and Savings Fund** ("Operating Engineers"): The comparable fee rate of $29 per participant is comprised of $29/pp of direct compensation paid to Newport from the 2021 Form 5500 Schedule C and no indirect compensation.

136.     The Operating Engineers Plan is a meaningful benchmark because at the end of 2021, the Operating Engineers Plan had around 10,486 participants, slightly more than the 9,560 participants in the Plan in 2021. The costs to a recordkeeper for providing Total RKA services to a plan with more than 3,000 participants are driven primarily by the number of participants. There are no material differences in the RKA services provided to plans as large as both the Operating Engineers Plan and the Smith & Nephew Plan and any service differentials cannot explain the disparity between the fees paid by the Operating Engineers Plan and the fees paid by the Smith & Nephew Plan.

137.     For example, the disparity of $34 per participant between the $29 per participant Total RKA rate for the Operating Engineers' fee compared to the Total RKA rate of $63 per participant paid by the Smith & Nephew Plan in 2021 represents over $320,000 annually and would conservatively represent more than 6,400 hours of RKA services in one year provided by employees of the recordkeeper. There are no special or different Total RKA services provided to any plan with between around 7,500 and 10,500 participants that would reasonably warrant incremental additional fees of over $320,000 for plans with similar numbers of participants.

138.     All else being equal, if the Operating Engineers Plan can obtain a fee of $29 per participant with 10,486 participants, then the Smith & Nephew Plan, which ranged in participants from around 8,024 to around 9,968 throughout the Class Period, should be able to obtain a fee of around $32 per participant, *or lower*, as indicated by the trend line generated from the Total RKA Fee rates paid by all the comparable plans.

139.     The Operating Engineers Plan is one of the closest 0.06% (six hundredth of 1%) of all defined contribution plans governed by ERISA. The massive disparity between the Total RKA fees paid by the Operating Engineers Plan and the Smith & Nephew Plan's estimated effective Total RKA fee rate of around $63 per participant, viewed holistically and in conjunction with the evidence of the fees paid by all the other comparable plans, leads to a plausible inference that the Plan paid excessive and unreasonable Total RKA fees and the Plan's fiduciary process was imprudent.

140.     In summary, the disparity between the Total RKA fees paid by the Smith & Nephew Plan and the Total RKA fees paid by the comparable plans identified above cannot be plausibly explained by immaterial service disparities described on 5500 Forms or elsewhere because there are no material differences in the Total RKA services provided to plans as large as the Smith & Nephew Plan and the comparable plans.

141.     The tables and graphs above illustrate that the Plan paid Total RKA fees to Fidelity of between $55 and $68 per participant which is much higher than the Total RKA fees paid by the other comparable plans from 2018-2022.

142.     The disparity between the fee rates of the comparable plans based on the amount of participants in each of the plans and the reliable estimate based on the trend line created by the comparable plans fee rates is $5 per participant or less and is plausibly explained by minor variations in negotiation tactics and circumstances among the fiduciaries of the comparable plans and the various recordkeepers.

143.     Based on the Smith & Nephew Plan's features, the commoditized and fungible nature of the Total RKA services provided by Fidelity, the number of participants in the Plan (approximately 10,000), and the recordkeeping market, $32 was the reasonable per participant fee.

144. From 2018 to 2022, an unreasonable disparity of $30 per participant for Plan Total RKA (a premium of 100%) compensation existed.

145. The Smith & Nephew Plan RKA amounted to unreasonable compensation relative to the RKA services rendered by Fidelity.

146. From the years 2018 through 2022, had Defendants been acting prudently, the Plan actually would have paid significantly less than an average of approximately $561,965 per year in RKA fees, which equated to an effective average of approximately $62 per participant per year.

147. From the years 2018 through 2022, the Plan additionally cost its participants on average approximately $271,252 per year in additional RKA fees, which equates to on average approximately $32 per participant per year.

148. From the years 2018 to 2022, and because Defendant Plan Committee did not act prudently, and as compared to other plans of similar sizes and with a materially similar level and quality of fungible and commoditized services, the Plan paid approximately **$1,356,259** in unreasonable RKA compensation beyond what they should have paid for such services.

149. When accounting for compounding percentages/lost market investment opportunity, Defendant Plan Committee paid **$1,406,579** more in RKA compensation to Fidelity than they should have during the Class Period if they had acted prudently in selecting and maintaining an RKA service provider.

E. **SMITH & NEPHEW'S PROHIBITED USES OF PLAN FORFEITURE ASSETS**

150. The Smith & Nephew Plan is funded by a combination of wage withholdings by Plan participants and Company matching and non-elective contributions, each of which is deposited into the Plan's trust fund.

151. Upon their deposit into the Smith & Nephew Plan's trust fund, *all participant contributions and Company contributions become assets of the Plan*.

152. Participants are fully vested in their salary deferrals plus actual earnings thereon. Vesting in Employer contributions is based on years of qualified service with and vest fully after four years of service, according to the Plan document.

153.    Forfeitures are the nonvested portion of a participant's account that is lost upon termination of employment before full vesting occurs. Forfeitures are still plan assets.

154.    The Plan document states with regard to forfeitures the following:

> Allocation of Forfeitures.  The total amount forfeited during any Plan Year pursuant to Section 7.3 from the accounts of Participants employed by an Employer, reduced by the amount of such forfeitures credited to the accounts of former Participants who have been reemployed pursuant to Section 8.2, *shall first be used to defray reasonable Plan administration expenses and then to decrease contributions required by the Employers for the Plan Year*.

> *See* Section 6.3(f) of the Plan Document (emphasis added).

155.    In turn, Section 7.3 of the Plan Document states in pertinent part:

> Amounts forfeited pursuant to this Section shall be used to *defray reasonable Plan administration expenses and to reduce future contributions to the Plan by the Employer* of such Participant or, if so established through the Committee's procedures, of other Participants.

> *See* Section 7.3(f) of the Plan Document (emphasis added).

156.    Defendant Plan Committee did not use Plan forfeitures to defray "reasonable" Plan administration expenses, but instead used these forfeitures to pay "unreasonable" Plan administration expenses in the form of excessive Plan fees, as described in detail in the previous section, and then utilized the remaining tens of millions of dollars during the Class Period to benefit Smith & Nephew by reducing their employer contributions to the Plan.

157.    Such use of Plan forfeitures to pay unreasonable Plan administration expenses is a prohibited transaction because the Plan fiduciaries are using Plan assets to pay a party-in-interest, Fidelity, for services. *See* 29 U.S.C. § 1106(a)(1)(C).

158.    This prohibited transaction is not saved by exemption because the excessive RKA fees do not constitute reasonable compensation for services rendered under ERISA Section 408(b)(2)(A) for the reasons discussed in the previous section. *See* 29 U.S.C. § 1108(b)(2)(A).

159.    Defendants utilized Plan forfeitures to pay this unreasonable compensation for RKA services in the amount that averaged $62 per year per participant during the Class Period, when only

$32 per year per participant should have been utilized for that purpose based on comparison to similarly-sized plans receiving materially similar RKA services.

160. Consequently, the Plan Committee utilized **$1,406,579** more than they should have in Plan forfeitures to pay Plan participants' unreasonable RKA compensation.

161. The excess forfeiture money used for unreasonable Plan administrative expense should have been used to increase benefits in other Plan participants' accounts, which is a common practice by 401(k) plans similar to the Smith & Nephew Plan.

162. The use of Plan forfeitures to reduce future employer contributions to the Plan is also a prohibited transaction because the Plan fiduciaries are using Plan assets for the benefit of a party-in-interest, Smith & Nephew. *See* 29 U.S.C. § 1106(a)(1)(D).

163. ***Employer*** contributions should be paid out of the general assets of the employer not out of Plan assets in the form of Plan forfeitures that belong rightfully to Plan participants.

164. There is no exemption that applies to the use of Plan assets for the benefit of the employer.

165. IRS guidance regarding the reducing of employer contributions through use of Plan forfeitures either do not speak to prohibited transactions and/or have been superseded.

166. Smith & Nephew received over $18 million in Plan assets during the Class Period to improperly reduce their own Plan employer contributions:

## Forfeitures Used for Employer's Benefit

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|
| *Compounding Percentage (Plan Return)* | | *23.55%* | *17.39%* | *14.72%* | *-18.19%* | *21.87%* |
| *Forfeitures Used by Plan to pay for Administrative Expenses and offset current year employer contributions* | *$3,239,719* | *$2,886,658* | *$3,395,221* | *$5,122,560* | *$3,670,182* | |
| *Estimated Administrative Expenses Paid with Forfeitures* | *$606,781* | *$616,150* | *$610,140* | *$783,327* | *$770,287* | |
| Forfeitures Used by Plan to offset Employer Contributions | $2,632,938 | $2,270,508 | $2,785,081 | $4,339,233 | $2,899,895 | |
| **Cumulative Compounded Reduce Employer Contribution Losses** | **$2,632,938** | **$5,523,564** | **$9,269,369** | **$14,973,191** | **$15,148,971** | **$18,462,199** |

Sources:
2018 Form 5500, Page 28 of 50    2019 Form 5500, Page 28 of 52    2020 Form 5500, Page 28 of 50    2021 Form 5500, Page 30 of 54    2022 Form 5500, Page 32 of 56

167. Such use of Plan forfeitures to reduce future employer contributions to the Plan is also a fiduciary prohibited transaction, to which no exemption applies, because the Defendants, as Plan fiduciaries, are "deal[ing] with the assets of the plan in [their] own interest." *See* 29 U.S.C. § 1106(b)(1).

168. Losses from misallocation of Plan forfeitures for Smith & Nephew benefit are calculated in the chart above by taking the full amount of the forfeiture and reducing that amount by the administrative expenses that were paid with Plan forfeitures.

169. The forfeiture money should not have been used to benefit Smith & Nephew through reduced Plan employer contributions and instead, should have been reallocated to Plan participant accounts, as is common practice by 401(k) plans similar to the Smith & Nephew Plan.

170. For instance, in their 2022 Form 5500 notes to Financial Statements, the KCI Technologies, Inc. Employee Stock Ownership Plan states the following regarding forfeited accounts: "Forfeitures of Company contributions are first used to restore previously forfeited amounts to rehired employees. To the extent that any forfeitures remain, *they are reallocated to participants' accounts based on the ratio of each participant's account to the aggregate of all accounts*."

171. Similarly, in their 2022 Form 5500 notes to Financial Statements, the Enterprise Holdings Retirement Savings Plan states the following regarding forfeited accounts: "[F]orfeited account balances are allocated to eligible participant accounts based only on participants' eligible

compensation to the extent the participant meets minimum service requirements and is employed as of the end of the plan year."

172.     Consistent with Plans using Plan forfeitures in a manner that does not constitute prohibited transactions, the Smith & Nephew Plan should have used forfeiture assets to increase benefits in other participants' accounts rather than benefit themselves by using plan assets for their own purposes to reduce their future employer contributions to the Plan.

173.     By instead using these Plan forfeiture assets to reduce Smith & Nephew's obligation to make employer contributions to the Plan, Defendants violated both the fiduciary and party-in-interest prohibited transaction rules under ERISA.

174.     These prohibited transactions cost the Plaintiffs and class members tens of millions of dollars in lost Plan assets that should have been used to increase benefits in other participants' accounts.

**F.      EXCESSIVE PPA MA SERVICE FEES PAID TO STRATEGIC ADVISORS**

175.     The key characteristics of managed account (MA) services are: (1) participants turn over discretion to the advice provider; (2) the provider assumes responsibility for the asset allocation and selection decisions, generally utilizing investment options offered with the plan; and (3) decisions are based on information provided to the provider by the plan sponsor and/or recordkeeper, as well as through interaction with the participant (this information may include investment objectives, risk preferences, and investments held outside the defined contribution plan.

176.     The Smith & Nephew Plan provided a managed account (MA) service, PPA, through Fidelity's wholly-owned subsidiary, Strategic Advisors ("SA").

177.     The MA services provided by SA, through the PPA, to the Smith & Nephew Plans are materially similar to those provided by SA and Financial Engines to other comparator plans.

178.     Like Financial Engines, SA provides the substantially similar core asset allocation services to all plans for which it acts as the MA service provider.

179.     Because several recordkeepers have additional MA solutions or have built their own, downward pressure has been created on MA fees across the industry.

180. Yet, according to the Smith & Nephew Plan June 10, 2024 Annual Fee Disclosure Statement for Participants, PPA advisory fee is estimated not to exceed 0.51% per year of your average daily managed account balance and is deducted quarterly.

181. Defendants paid unreasonable compensation for MA fees when compared to similarly-sized plans receiving materially similar MA services from SA and Financial Engines.

182. Because the MA services provided by SA to plans are materially similar to other managed account services provided by SA and Financial Engines, the costs of MA services should also be materially similar for plans which have a similar number of participants and assets.

183. Just like RKA services, SA PPA managed account services are fungible and commoditized in this manner.

184. More specifically, these figures for the comparator plans are taken directly from the comparator plans' Fee Disclosures to Participants and show how much less they paid for materially similar MA services:

**Endeavor Air**:

| Professional Management Fees | |
|---|---|
| **Managed Account Balance** | **Annual Fee** |
| For the balance up to **$350,000 you'll pay:** | 0.20% of this balance |
| For the balance greater than **$350,000 you'll pay:** | 0.15% of this balance |

**S.C. Johnson**:

| Professional Management Fees | |
|---|---|
| **Managed Account Balance** | **Annual Fee** |
| For the balance up to **$5,000 you'll pay:** | 0.00% of this balance |
| For the balance between **$5,000.01 and $75,000 you'll pay:** | 0.28% of this balance |
| For the balance between **$75,000.01 and $150,000 you'll pay:** | 0.18% of this balance |
| For the balance between **$150,000.01 and $1,000,000 you'll pay:** | 0.15% of this balance |
| And for the balance greater than **$1,000,000.01 you'll pay:** | 0.13% of this balance |

**Trinity Health:**

| Personalized Planning & Advice | If you utilize this service, the advisory fee is estimated not to exceed 0.25% per year of your average daily managed account balance and is deducted quarterly. |
|---|---|

**Blue Cross Blue Shield of SC:**

| Professional Management Fees | |
|---|---|
| **Managed Account Balance** | **Annual Fee** |
| For the balance up to **$100,000 you'll pay:** | 0.30% of this balance |
| For the balance between **$100,000.01 and $250,000 you'll pay:** | 0.20% of this balance |
| For the balance greater than **$250,000 you'll pay:** | 0.15% of this balance |

185.   The average of all the comparative Plan MA fees is 25.8 basis points for MA services:

**Comparable Plans' Managed Account Fee Rates**

| Plan | Average Assets 2018-2023 | Average Participants 2018-2023 | Average Managed Account Direct Comp 2018-2023 ($) | Managed Account Fee Not To Exceed | Managed Account Provider |
|---|---|---|---|---|---|
| Endeavor Air Savings Plan | $142,747,926 | 3,953 | $46,496 | 0.200% | Strategic Advisors / Financial Engines |
| S.C. Johnson & Son, Inc. Employees Deferred Profit and Savings Plan | $1,435,349,880 | 4,340 | $907,283 | 0.280% | Financial Engines |
| Trinity Health 401(K) Retirement Savings Plan | $744,165,755 | 11,523 | $27,676 | 0.250% | Strategic Advisors |
| Blue Cross Blue Shield of SC Employee Savings and Salary Reduction Plan | $1,103,906,957 | 12,798 | $967,560 | 0.300% | Financial Engines |
| | | | | **Average** | **0.258%** |

186.   The following charts shows the breakdown of direct compensation paid by comparator plans to their managed account providers during the Class Period:

**Schedule C - Managed Account Direct Compensation**

| Plan | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | *Total* | *Average* |
|---|---|---|---|---|---|---|---|---|
| Endeavor Air Savings Plan | $33,897 | $31,362 | $17,783 | $58,690 | $65,096 | $72,147 | *$278,975* | *$46,496* |
| S.C. Johnson & Son, Inc. Employees Deferred Profit and Savings Plan | $854,434 | $840,599 | $855,184 | $998,776 | $981,935 | $912,769 | *$5,443,697* | *$907,283* |
| Trinity Health 401(K) Retirement Savings Plan | $0 | $0 | $10,685 | $44,482 | $54,648 | $56,243 | *$166,058* | *$27,676* |
| Blue Cross Blue Shield of SC Employee Savings and Salary Reduction Plan | $930,246 | $881,727 | $920,537 | $1,072,356 | $1,029,834 | $970,659 | *$5,805,359* | *$967,560* |

187. Yet, Smith & Nephew continues to pay unreasonable compensation for MA service for SA's PPA for the materially same MA services from SA or Financial Engines being received by these other comparator plans with similar numbers of participants and assets during the Class Period.

188. Whereas Smith & Nephew pays up to 51 basis points in fees, the comparators plans pay an average of up to 25.8 basis points in fees:

| Comparable Plans' Managed Account Fee Rates | | | | | |
|---|---|---|---|---|---|
| Plan | Average Assets 2018-2023 | Average Participants 2018-2023 | Average Managed Account Direct Comp 2018-2023 ($) | Managed Account Fee Not To Exceed | Managed Account Provider |
| Endeavor Air Savings Plan | $142,747,926 | 3,953 | $46,496 | 0.200% | Strategic Advisors / Financial Engines |
| S.C. Johnson & Son, Inc. Employees Deferred Profit and Savings Plan | $1,435,349,880 | 4,340 | $907,283 | 0.280% | Financial Engines |
| Smith & Nephew U.S. Savings Plan | $1,129,084,239 | 9,152 | $343,419 | 0.510% | Strategic Advisors |
| Trinity Health 401(K) Retirement Savings Plan | $744,165,755 | 11,523 | $27,676 | 0.250% | Strategic Advisors |
| Blue Cross Blue Shield of SC Employee Savings and Salary Reduction Plan | $1,103,906,957 | 12,798 | $967,560 | 0.300% | Financial Engines |

189. Smith & Nephew's excessive and unreasonable payments to SA for materially the same MA services provided to other plans by SA and Financial Engines has cost Plan participants enrolled in the MA program, like Plaintiff Cooley, over one million dollars in lost retirement income:

| Strategic Advisors - Excess Compensation over 25.8bps | | | | | | | |
|---|---|---|---|---|---|---|---|
| Provider | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Total |
| STRATEGIC ADVISORS, INC. | $223,122 | $260,160 | $302,575 | $406,697 | $411,682 | $456,277 | $2,060,513 |
| | | | | | | | |
| Estimated Assets @ .51% | $43,749,412 | $51,011,765 | $59,328,431 | $79,744,510 | $80,721,961 | $89,466,078 | |
| Estimated Compensation at .258% | $112,655 | $131,355 | $152,771 | $205,342 | $207,859 | $230,375 | |
| | | | | | | | |
| Excess Compensation | $110,467 | $128,805 | $149,804 | $201,355 | $203,823 | $225,902 | |
| Compounding Percentage (VIIIX) | | 31.48% | 18.41% | 28.69% | -18.13% | 26.26% | |
| Estimated Cumulative Losses | $110,467 | $274,047 | $474,303 | $811,736 | $868,391 | $1,322,333 | |

190. A plan fiduciary must monitor MA compensation that it pays to the MA service provider by regularly conducting an independent evaluation of those fees to ensure that such administrative fees are reasonable and remove or renegotiate with the MA provider if those fees are unreasonable or imprudent.

191. During the Class Period, Defendants egregiously failed to regularly monitor the MA compensation paid to SA.

192.     During the Class Period, Defendants failed to consider other alternatives to the SA MA service in order to avoid having Plan participants pay excessive and unreasonable MA fees.

193.     During the class period, and unlike a hypothetical prudent fiduciary, Defendants followed a fiduciary process that was ineffective given the objectively unreasonable MA fees.

194.     The Plan Committee, as Plan fiduciaries, should have compared the Plan PPA MA to other MAs through periodic reviews to determine whether given cost, risk, performance, and other pertinent factors, maintaining SA as the Plan MA service provide was prudent.

195.     During the entirety of the class period, and had Defendants engaged in regular and/or reasonable examination and competitive comparison of the total administrative fees it paid to SA, it would have realized that the Plan was compensating SA unreasonably and inappropriately for its size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiff Cooley and other Plan participants in the PPA MA service.

196.     During the entirety of the class period and by failing to recognize that the Plan and its participants were being charged much higher Plan MA fees than they should have been and/or by failing to take effective and timely remedial actions including replacing SA, Defendants breached their fiduciary duty of prudence to Plaintiff Cooley and to other Plan participants, causing millions of dollars of harm to Plaintiff Cooley and other Class member's retirement accounts..

## G.     CLASS ACTION ALLEGATIONS

197.     Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(1), or, in the alternative, 23(b)(2) of the Federal Rules of Civil Procedure on behalf of the following subclasses of similarly situated persons:

Subclass A – Forfeiture Class:

All participants in and beneficiaries of the Smith & Nephew 401(k) Plan at any time from the earlier of (i) six years before the filing of this action, or (ii), in the event the Court determines that Defendants have concealed the facts and circumstances that would have apprised Plaintiffs and the Class of the existence of Defendants' breaches through the date of judgment.

<u>Subclass B – Managed Account Class</u>:

All participants in and beneficiaries of the Smith & Nephew 401(k) Plan who participated in the Plan managed account program at any time from the earlier of (i) six years before the filing of this action, or (ii), in the event the Court determines that Defendants have concealed the facts and circumstances that would have apprised Plaintiffs and the Class of the existence of Defendants' breaches through the date of judgment

198.    The members of each of the subclasses are so numerous that joinder of all members is impracticable.  At all relevant times, the number of forfeiture class members was approximately ten thousand (10,000) or more, while the number of managed account class members was one thousand (1,000) or more.

199.    Common questions of law and fact exist as to all members of each of the Subclasses. Among such questions are:

i.  Whether Defendants failed in their fiduciary duties with respect to the administration, management and supervision of recordkeeping providers (forfeiture subclass);

ii.  Whether Defendants failed in their fiduciary duties to act as prudent financial managers and to minimize plan RKA and managed account fees (both subclasses);

iii.  Whether Defendants engaged in fiduciary or party-in-interest prohibited transactions with plan assets, by using Plan forfeitures to pay unreasonable Plan administrative expenses and by reducing Smith & Nephew's Plan contributions rather than reallocating those plan assets to Plan participants accounts (forfeiture subclass); and,

iv.  Whether Defendants' breaches of fiduciary duties and prohibited transactions caused losses to the Plan and its participants, and if so, in what amounts (both subclasses).

200.    Plaintiffs' claims are typical of the claims of the Forfeiture Subclass and Plaintiff's Cooley's managed account claims are typical of the claims of the Managed Account Subclass pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiffs were participants during the time period at issue and all participants in the Plan were harmed by Defendants' misconduct for each Subclass.

201.    Plaintiffs will adequately represent the Subclasses pursuant to Federal Rule of Civil Procedure 23(a)(4), because they were participants in the Plan during the class period, have no interest that conflicts with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent lawyers to represent the Class.

202. Class certification of Plaintiffs' claims is appropriate pursuant to Fed. R. Civ. P. 23(b)(1) because the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Defendants, and/or because adjudications with respect to individual Class members would as a practical matter be dispositive of the interests of non-party Class members.

203. In the alternative, certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

204. Plaintiffs' attorneys have substantial and varied experience in complex ERISA and class action litigation and will adequately represent the Class.

205. The claims brought by the Plaintiffs arise from fiduciary breaches and prohibited transactions as to the Plan in its entirety and does not involve mismanagement of individual accounts.

206. The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in the individual participants' Plan.

207. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

208. Under ERISA, an individual "participant" or "beneficiary" is distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

209. Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

# FIRST CLAIM FOR RELIEF
### Fiduciary Prohibited Transactions
### (Plaintiffs, On Behalf Of Themselves and Class,
### Against Plan Committee – Self-Dealing With Plan Forfeitures)

210.    Plaintiff restates the above allegations as if fully set forth herein.

211.    29 U.S.C. § 1106(b) provides that "[a] fiduciary with respect to a plan shall not," among other things, "deal with the assets of the plan in his own interest or for his own account."

212.    Defendant Plan Committee violated this prohibition in its management and control of Plan forfeitures, which are Plan assets.

213.    By allocating these Plan assets toward offsetting Smith & Nephew's future contributions owing to the Plan, thereby saving Smith & Nephew tens of millions of dollars in employer contribution expenses, Defendant Plan Committee dealt with the assets of the Plan in their own interest and for their own account.

214.    As a result of this prohibited conduct, Defendant Plan Committee did not allocate these Plan forfeitures to Plan participant accounts, causing the Plan in aggregate to lose tens of millions of dollars.

215.    Defendant Plan Committee and its members are personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the prohibited conduct alleged in this claim, to restore to the Plan all assets and profits obtained through the improper use of Plan assets, and is subject to other equitable or remedial relief as appropriate.

# SECOND CLAIM FOR RELIEF
### Party-In-Interest Prohibited Transactions
### (Plaintiffs, On Behalf Of Themselves and Class,
### Against Plan Committee – Unreasonable RKA Compensation)

216.    Plaintiff restates the above allegations as if fully set forth herein.

217.    29 U.S.C. § 1106(a)(1)(C) provides that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect - furnishing of . . . services . . . between the plan and a party in interest."

218.     The Defendants, as fiduciaries of the Smith & Nephew Plan, caused the Plan to engage in a transaction that constitutes a direct furnishing of RKA services between the Plan and a party in interest, Fidelity by paying for such RKA services with Plan forfeitures.

219.     29 U.S.C. § 1108(b)(2)(A) states that "[t]he prohibitions provided in section 1106 . . . shall not apply to any of the following transactions: . . . [c]ontracting or making reasonable arrangements with a party in interest for . . . services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor."

220.     The exemption does not apply to Fidelity's RKA services for the Plan because more than reasonable compensation was paid for Fidelity RKA services compared to what other similarly-sized comparator plans paid for materially similar RKA services from other Plan recordkeepers.

221.     By allocating these Plan forfeitures to be used to pay unreasonable compensation for Plan RKA services, Smith & Nephew misused millions of dollars of Plan forfeitures which could have been reallocated instead to Plan participant's accounts.

222.     Defendant Plan Committee and its members are personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the prohibited conduct alleged in this claim, to restore to the Plan all assets and profits obtained through the improper use of Plan assets, and is subject to other equitable or remedial relief as appropriate.

**THIRD CLAIM FOR RELIEF**
**Party-In-Interest Prohibited Transactions**
**(Plaintiffs, On Behalf Of Themselves and Class,**
**Against Plan Committee – Benefitting Employer)**

223.     Plaintiff restates the above allegations as if fully set forth herein.

224.     29 U.S.C. § 1106(a)(1)(D) provides that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect - transfer to, or use by or for the benefit of a party in interest, of any assets of the plan."

225.     Defendant Plan Committee, as fiduciaries of the Smith & Nephew Plan, caused the Plan to engage in a transaction that used the assets of Plan for the benefit of a party in interest, Smith & Nephew, by using Plan forfeitures to reduce the future employer contributions of Smith & Nephew.

226.	There is no exemption to the prohibited transaction of a Plan fiduciary using plan assets to benefit a party-in-interest, like the employer.

227.	By allocating Plan forfeitures to be used for the benefit of reducing future employer contributions, the Plan Committee misused tens of millions of dollars of Plan forfeitures which could have been reallocated instead to Plan participant's accounts.

228.	Defendant Plan Committee and its members are personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the prohibited conduct alleged in this claim, to restore to the Plan all assets and profits obtained through the improper use of Plan assets, and is subject to other equitable or remedial relief as appropriate.

**FOURTH CLAIM FOR RELIEF**
**Breach of Duty of Prudence of ERISA, as Amended**
**(Plaintiff Cooley, on Behalf of Herself and Class, Against**
**Defendant Plan Committee – Excessive Managed Account Fees)**

229.	Plaintiff Cooley restates the above allegations as if fully set forth herein.

230.	Defendant Plan Committee is a fiduciary of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

231.	29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Defendant Plan Committee in its administration of the Plan.

232.	Defendant Plan Committee, as a fiduciary of the Plan, is responsible for selecting managed account providers that charge objectively reasonable managed account fees.

233.	During the Class Period, Defendant Plan Committee had a fiduciary duty to do all of the following: ensure that the Plan's managed account fees were objectively reasonable; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

234.	During the Class Period, Defendant Plan Committee breached their fiduciary duty of prudence to Plan participants, including to Plaintiff Cooley, by failing to: ensure that the Plan's managed account fees were objectively reasonable, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

235. During the Class Period, Defendant Plan Committee further had a continuing duty to regularly monitor and evaluate the Plan's managed account provide, SA, to make sure they were providing the managed account services at reasonable costs, given the highly competitive market surrounding managed account services and the enormous bargaining power the Plan had to negotiate the best fees, and replace the imprudent managed account with a less costly managed account service.

236. During the Class Period, Defendant Plan Committee breached its duty to Plan participants, including to Plaintiff Cooley, by failing to employ a prudent process and by failing to evaluate the cost of the Plan's managed account service critically or objectively in comparison to other managed account options available to the Plan.

237. Defendant Plan Committee's failure to discharge its duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

238. As a result of Defendant Plan Committee's breach of fiduciary duty of prudence with respect to the Plan, the Plaintiff Cooley and Plan participants suffered millions of dollars in objectively unreasonable and unnecessary monetary losses.

239. Defendant Plan Committee is liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Smith & Nephew Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendant Plan Committee is subject to other equitable relief as set forth in the Prayer for Relief.

### FIFTH CLAIM FOR RELIEF
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
**(Plaintiff Cooley, on Behalf of Herself and Class, Against**
**Defendants Smith & Nephew and Board – Excessive Managed Account Fees)**

240. Plaintiff Cooley restates the above allegations as if fully set forth herein.

241. Defendants Smith & Nephew and Board had the authority to appoint and remove members or individuals responsible for managed accounts on the Plan Committee and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

242. In light of this authority, Defendants Smith & Nephew and Board had a duty to monitor those individuals responsible for managed account fees on the Plan Committee to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

243. Defendants Smith & Nephew and Board had a duty to ensure that the individuals responsible for managed account fees possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to managed account fees; and reported regularly to Defendants Smith & Nephew and Board.

244. The objectively excessive managed account fees paid by the Plan by having SA's PPA managed account program inferentially establish that Defendants Smith & Nephew and Board breached their duty to monitor by, among other things:

> (a) Failing to monitor and evaluate the performance of individuals responsible for managed account fees on the Plan Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unnecessary managed account fees;
>
> (b) Failing to monitor the process by which the Plan's managed account provider, SA, was evaluated and failing to investigate the availability of more reasonably-priced managed account alternatives; and
>
> (c) Failing to remove individuals responsible for managed account fees on the Plan Committee whose performance was inadequate in that these individuals continued to pay the same managed account fees over numerous years even though the managed account fees were unnecessary, given the availability of materially similar managed account programs for less cost.

245. As a consequence of the breach of the duty to monitor the Plan's managed account fees, the Plaintiff Cooley and Plan participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

246. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants Smith & Nephew and Board are liable to restore to the Smith & Nephew Plan all losses caused by their failure to adequately

monitor individuals responsible for Plan managed account fees on the Plan Committee. In addition, Plaintiffs and the Class are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

WHEREFORE, Plaintiffs pray that judgment be entered and requests the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A Declaration the Defendants are fiduciaries, have breached their fiduciary duties of prudence under ERISA, and engaged in fiduciary and party-in-interest prohibited transactions, causing harm to Plan participants and beneficiaries;

D.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' prohibited transactions, including restoring to the Plan all losses resulting from using Plan forfeitures to pay unreasonable compensation for RKA fees and to inappropriately benefit Smith & Nephew by reducing their future employer contributions, and restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Participants would have made if the Defendants had not engaged in prohibited transactions;

E.    An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breach of the fiduciary duty prudence by paying excessive managed account fees, and restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

F.    An Order requiring Smith & Nephew to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against Smith & Nephew as necessary to effectuate relief, and to prevent Smith & Nephew's unjust enrichment;

G.    An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

H.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary/consultant or fiduciaries to run the Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties;

I.    An award of pre-judgment interest;

J.  An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

K.  Such other and further relief as the Court deems equitable and just.

Respectfully submitted,

Date: November 22, 2024

**WALCHESKE & LUZI, LLC**

*/s/ Paul M. Secunda*
Paul M. Secunda (admitted *pro hac vice*)
235 N. Executive Dr., Suite 240
Brookfield, Wisconsin 53005
Telephone: (414) 828-2372
psecunda@walcheskeluzi.com

**JONATHAN M. FEIGENBAUM, ESQ.**

Jonathan M. Feigenbaum
BBO #546686
184 High Street, Suite 503
Boston, MA 02110
Telephone: (617) 357-9700
jonathan@erisaattorneys.com

*Attorneys for Plaintiffs and Proposed Class*